GENERAL TEAMSTERS, CHAUFFEURS AND HELPERS, LOCAL UNION NO. 249, Plaintiff,

v.

POTTER–McCUNE COMPANY, Defendant.

Civil A. No. 75–1415.

United States District Court, W. D. Pennsylvania.

May 7, 1976.

Ernest B. Orsatti, Jubelirer, McKay, Pass & Intrieri, Pittsburgh, Pa., for plaintiff.

Alexander Unkovic, William A. Meyer, Jr., Meyer, Unkovic & Scott, Pittsburgh, Pa., for defendant.

OPINION

TEITELBAUM, District Judge.

This is an action under Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, to vacate a labor arbitration award rendered in a grievance proceeding involving a hiring practice of the defendant company. The plaintiff union contends that the arbitrator's award should be set aside on grounds that it fails to "draw its essence" from the parties' collective bargaining agreement in accordance with the standard enunciated by the Supreme Court in *United Steelworkers of America v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). The company has responded by way of a motion to dismiss the complaint on grounds that the decision of the arbitrator—issued in resolution of an admittedly arbitrable dispute and *"final and binding upon both parties"* under Article 15 of the applicable labor

contract—is not in manifest disregard of the collective bargaining agreement and the practices of the shop, and therefore must not be disturbed by this Court. I agree. Accordingly, for the reasons stated below, defendant's motion will be granted and the action dismissed.

## FACTUAL BACKGROUND

Article 2 of the collective bargaining agreement between the parties to this case provides in pertinent part as follows:

"(d) *Hiring Practice:* The employer will call extra men from the extra list provided by Local 249. If 249 does not have men available, the employer may employ whomever it chooses. The employer can use extra drivers from the 249 extra list up to one (1) calendar week without a driver accruing any seniority. However, if the employer calls the extra list and asks for a driver by name, *or calls the driver directly after the first week,* then the driver will begin to accumulate seniority on the extra list and he will be considered a regular extra employee. Extra drivers will not go on the employer's regular driver seniority list until the extra driver has accrued sixty (60) consecutive working days.

"It is understood that the purpose of this clause is not to keep men from accumulating seniority on the extra list, but to give an opportunity to the employer to try out an employee for at least one (1) week of time. . . . " (emphasis supplied)

On the morning of January 31, 1975, after unsuccessful attempts to obtain extra drivers through the union hall extra list, representatives of the defendant company directly called the two grievants in this case—William Stuck and Daniel Bill—and asked them to report to work. Both men reported and worked as drivers for the company on that day. Prior to January 31, each grievant had worked for the company for at least one week in excess of 40 hours. The grievance was filed when defendant subsequently refused to classify Stuck and Bill as "regular extra employees" in accordance with the terms of Article 2, Section (d) of the collective bargaining contract.

Unable to arrive at a "*mutually satisfactory adjustment*" of the grievance, the union and company submitted the dispute to binding arbitration pursuant to Article 15 of their labor agreement. At arbitration, the union argued that the language contained in Article 2, Section (d) required that the grievants be granted regular extra employee status after they were called by the employer at their homes to report to work on January 31, 1975.

After a full hearing on the matter, the arbitrator rejected the union's position in an opinion and award which states the following at pages 19, 20 and 21:

"[W]hat we have present in this case is contract language that requires the employer to go first to the extra list to fill his needs for extra drivers. It permits the employer to use extra drivers from that list up to one full week but it severely restricts his asking for drivers by name from the extra list or calling a driver directly, after they have worked a full week. If that is done those employees should begin to accumulate seniority. The Article further emphasizes that the purpose of that clause is not to keep men from accumulating seniority but as a means for trying out an employee for a week.

"On the other hand, for ten years there has been a practice of the employer directly calling Local 249 men to serve as extras whenever the extra list was unable to supply the numbers needed. It is clearly a situation where the contract specifically requires one thing, while the practice that developed with the concurrence of the union was in contradiction to that language.

"In such a circumstance there is only one judgment that can be made. The parties have agreed to contract language that is clear and specific, and that language is not subject to amendment by an arbitrator. Therefore, it must stand. At

the same time the union has consistently condoned violation of that language. In so doing it gave to the company the right to believe that on January 31, 1975, when they called Mr. Stuck and Mr. Bill to report to work as extra drivers, it was only committing itself to its contractual obligation to an extra driver, and that it was not taking the two men on as regular extra drivers. If the union wishes to regain its rights under the contract, it is obliged to give the company advance notice of its intentions. This, it did not do prior to January 31, 1975, when the company acted on the basis of what it considered to be established procedures.

"As the Union Counsel stated in his brief, what caused this grievance to erupt was the hiring of an individual, who was never a member of the Local 249 bargaining unit, as a regular employee. It is fully understandable why the members of Local 249 would feel injured by this action. However, no matter how much this Arbitrator might sympathize with the feelings of the Grievants and Local 249 members, he has no authority to rule on that action by the Company. The issues before him in this case related to the meaning of the contract language contained in Article 2(d), the nature of the past practice that existed, and how that practice affected the grievance that was filed.

"It is therefore my award that with the requirements of the language contained in Article 2(d), the Company could have called directly Grievants Stuck and Bill on January 31, 1975, but it was only on the basis that they would have become a regular extra employee. However, on the basis of a long standing practice known to the Union and condoned by it, the Company was led to believe that its action on January 31, 1975, was a proper one and that it would not confer on the Grievants the status of regular extra employee. The Union is therefore estopped from applying the requirements of Article 2(d) retroactive to January 31, 1975 for this grievance.

It is the plaintiff union's contention that the above-quoted decision manifests a *"total disregard"* of the negotiated provisions of the parties' collective bargaining agreement and therefore should be set aside by this Court.

## DISCUSSION

In *United Steelworkers of America v. Enterprise Wheel and Car Corp., supra,* the third in a series of landmark decisions commonly styled the *"Steelworkers Trilogy,"* the Supreme Court outlined the role of the judiciary in reviewing an arbitrator's interpretation of a collective bargaining agreement as follows:

"[T]he question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." *Id.* at 599, 80 S.Ct. at 1362, 4 L.Ed.2d at 1429.

\* \* \* \* \* \*

"Nevertheless, an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement." *Id.* at 597, 80 S.Ct. at 1361, 4 L.Ed.2d at 1428.

The question before me is thus both quite narrow and somewhat ephemeral: does the instant arbitration decision meet the so-called *"essence test"* or does it manifest no more than the arbitrator's personal notion of justice, applied without regard for the contract of the parties. What complicates the inquiry is the elusive nature of the applicable standard. As the Court of Appeals for the Third Circuit has noted, the cases have not "exuded uniformity in translating the 'essence' test into a pronouncement of the appropriate extent or limita-

tion of judicial review of the arbitrator's interpretation." *Ludwig Honold Mfg. Co. v. Fletcher,* 405 F.2d 1123, 1126 (1969) (citing cases). It is clear, however, that this Court's role is sharply limited in that the "essence test" neither mandates nor permits review of the merits of the arbitrator's decision—his decision on the merits is final as to questions of both law and fact. *United Steelworkers of America v. Enterprise Wheel and Car Corp., supra* at 596, 80 S.Ct. at 1360, 4 L.Ed.2d at 1427; *Torrington Co. v. Metal Products Workers Union Local 1645,* 362 F.2d 677, 680 (2d Cir. 1966); *H. K. Porter Co. v. United Saw, File and Steel Products Workers,* 333 F.2d 596, 600 (3d Cir. 1964). Accordingly, the Court will refrain from expressing any view it might entertain as to the viability of the arbitrator's decision under orthodox contract analysis. My subjective opinion as to the proper construction or application of the instant labor contract is of no moment here. See, *e. g., Ludwig Honold Mfg. Co. v. Fletcher, supra.*

■ We turn, then, to matters within the scope of our inquiry and to a more precise delineation of its contours. In *Ludwig Honold Mfg. Co. v. Fletcher, supra,* the Third Circuit Court of Appeals, speaking through Judge Aldisert, further defined the "essence test" as follows:

"At the very least . . . [it] means that the interpretation of labor arbitrators must not be disturbed so long as they are not in 'manifest disregard' of the law, and that 'whether the arbitrators misconstrued a contract' does not open the award to judicial review.

"Accordingly, we hold that a labor arbitrator's award does 'draw its essence from the collective bargaining agreement' if the interpretation can in any rational way be derived from the agreement, viewed in the light of its language, its context, and any other indicia of the parties' intention; only where there is a manifest disregard of the agreement, totally unsupported by the principles of contract construction and the law of the shop, may a reviewing court disturb the award." *Id.* at 1128 (citations omitted).

The Court also stated that: "[w]here the actions of labor and management suggest an interpretation that qualifies the written language of the basic document it is incumbent upon the arbitrator to give credence to such acts," *Id.* at 1132 n. 36, and noted that in *H. K. Porter Co. v. United Saw, File and Steel Products Workers, supra,* it upheld one portion of the arbitrator's award although it was contrary to the literal language of the labor agreement because there was a clear pattern of past practice which justified the deviation. *Id.* at 1126 n. 13. That result in *H. K. Porter* followed largely from an application of the Supreme Court's language in *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 581–582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409, 1417 (1960), another member of the "*Steelworkers Trilogy,*" to the effect that:

". . . [t]he labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it."

The lens provided by *Ludwig Honold, H. K. Porter* and *Warrior & Gulf* sharpens the focus on our view of the case *sub judice.* The union here attacks the arbitrator's award solely on grounds that it is contrary to the plain language of the pertinent labor agreement, and, given the arbitrator's finding that the language of Article 2, Section (d) is clear and unambiguous, the Court accepts as true the union's contention that there is present in this case a refusal to enforce the literal terms of the contract. Standing alone, however, that refusal is not fatal to the instant award, for the "essence test" call for an inquiry both less restrictive and less facile than the simple comparison of award and literal contract terms urged by the union. Indeed, a standard involving no more than that strict comparison would not only reduce the arbitrator to a mere cipher, approaching his task blinded to all save the express terms of the contract and stripped of the opportunity to utilize his

special knowledge of the shop and the industry, it would also obviate the need for anything like the "essence test" delineated above.

The arbitrator in this proceeding looked first to the terms of the collective bargaining agreement and then applied those terms in light of a long-standing practice of the parties in instances where drivers could not be obtained by recourse to the union hall extra list. His decision, rooted in an estoppel construct, manifests far more than a merely personal, extracontractual judgment made in total disregard of the labor agreement—it demonstrates a clear attempt to reach an equitable result by means of filtering the literal language of the contract through the reality of tacitly-agreed practice in the shop. Whatever doubts may be raised as to the correctness of his construction of Article 2, Section (d), the arbitrator interpreted and applied the contract, and measured the effect of its express terms, in light of the "common law" of the plant. That is his proper function, and I am persuaded that his award passes the "essence test." It will not be disturbed by this Court.

Defendant's motion to dismiss will be granted. An appropriate Order will issue.