**In the Matter of the Arbitration between RAMSEY COUNTY, Respondent,**

**v.**

**AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, COUNCIL 91, LOCAL 8, Appellant.**

**No. 51227.**

Supreme Court of Minnesota.

Sept. 4, 1981.

---

Gregg M. Corwin, St. Louis Park, for appellant.

Tom Foley, County Atty., and Stephen F. Befort, Principal Asst. Atty. Gen., St. Paul, for respondent.

AMDAHL, Justice.

American Federation of State, County and Municipal Employees Council No. 91, Local 8 (hereinafter "Union") appeals from an order of the district court vacating an arbitration award on the ground that the arbitrator exceeded his powers. We reverse and remand this matter to the district court with instructions to reinstate the award.

In 1969, Ramsey County (hereinafter "County") adopted an Administrative Vacation Plan applicable to certain county personnel including employees in the classification of Real Estate Appraiser III. This plan granted a greater number of vacation days to the covered employees than other county employees but limited overtime com-

1. Section 2.1 of the agreement that was subsequently negotiated provides in pertinent part:
   2.1 The Employer recognizes the Union as exclusive representative for the following

pensation to a straight time basis and then only when specifically authorized.

In 1975, pursuant to Minn.Stat. § 179.67 subd. 4 (1974) of the Public Employment Labor Relations Act of 1971, the union was certified as the exclusive representative of County employees in various job classifications. The classification of Real Estate Appraiser III was included within the bargaining unit.[1]

The County and the Union thereafter negotiated a collective bargaining agreement effective for 1975. The vacation schedule contained in the new agreement differed from the Administrative Vacation Plan in that it provided for fewer vacation days but allowed overtime compensation at a rate of time and one-half for all work performed in excess of the regular work day, in excess of 40 hours in any work week, or on a scheduled day off. Section 1.2 of the preamble to the agreement states that "[a]ll personnel policies provided by this contract, unless otherwise stated, shall be applied uniformly across the entire bargaining unit."

After 1975, the agreement was renewed or renegotiated at least twice for terms of either one or two years. The provisions of the original collective bargaining agreement that are relevant to this dispute were not changed and are contained in the agreement in effect at the present time.

In March of 1979, the County converted to a computerized personnel system. The County claims that it then discovered that the six employees in the Real Estate Appraiser III classification who were appointed prior to the effective date of the collective bargaining agreement continued to accrue vacation time as provided under the Administrative Vacation Plan. The six appraisers were notified of the alleged error and informed that they would immediately be placed under the existing rate for vacation accrual in accordance with the collective bargaining agreement.

classifications in the Ramsey County General recognized bargaining unit:
   \*   \*   \*   \*   \*   \*
   Real Estate Appraiser III

The Union thereafter filed a class action grievance [2] on behalf of the six appraisers, alleging the existence of an oral agreement between the parties that only appraisers appointed after January 1, 1976 would be subject to the vacation schedule set forth in the collective bargaining agreement and that the six appraisers in question could continue to accrue vacation time pursuant to the Administrative Vacation Plan. The union asserted that the six appraisers, relying to their detriment on the oral agreement, did not put in for overtime compensation to which they would otherwise have been entitled and claimed that the past practice of the parties with regard to vacation time of the six appraisers bound the County to continue the policy. The County denied the grievance at each step of the grievance procedure, asserting that the collective bargaining agreement was clear and unambiguous on its face, denying any other agreement between the parties concerning the six appraisers and alleging that it acted promptly as soon as it discovered its error.

Unable to settle the dispute, the parties submitted to compulsory binding arbitration as required by Minn.Stat. § 179.70, subd. 1 (1980) pursuant to Step 4 of the grievance procedure set forth in the agreement. It was stipulated that the dispute was properly before the arbitrator for decision and that the issue to be resolved was whether "the county violated its agreement with AFSCME Council when it altered the vacation accumulation rate of six (6) Real Estate Appraiser III's."

The arbitrator selected by the parties issued an award sustaining the grievance. The award provided:

2. Section 15.1 of the agreement defines a grievance as a "dispute or disagreement as to the interpretation or application of the specific terms and conditions of this agreement."

3. Past practice has been defined as "a prior course of conduct which is consistently made in response to a recurring situation and regarded as a correct and required response under the circumstances." Certain qualities distinguish a binding past practice from a course of conduct that has no particular evidentiary significance:
   (1) clarity and consistency
   (2) longevity and repetition
   (3) acceptability

These 6 Real Estate Appraiser III's are to be 'grandfathered' into the existing agreement exclusively at the vacation accumulation rates previously earned, providing that at the same time their restrictions on overtime continue. All other Appraiser III's will accumulate vacation as provided in the Master Contract. * *

In so deciding, the arbitrator recognized that although the contractual language at issue was clear and unequivocal on its face, the past practice of the parties with regard to vacation accrual of the six appraisers satisfied the criteria of mutuality, specificity, specific duration and reliance and was thereby binding upon the parties as a condition of employment notwithstanding the vacation schedule set forth in the collective bargaining agreement.[3] It was additionally noted that there was some indication that the parties had an understanding that the vacation schedule under the new agreement would be applied only to new appraisers and that the six appraisers, because of their overtime work, could continue to accumulate vacation time under the more liberal Administrative Vacation Plan. In response to the fact that the contract was silent on the matter, the arbitrator referred to testimony indicating that the issue of a different vacation policy for the six appraisers was not discussed during negotiations in reliance upon the county's assurances that the prior policy would be continued. Finally, the arbitrator stated that it did not stand to reason that the appraisers should be in essence penalized for the award oversight which the county admitted "could have been discovered by Central Personnel."

(4) a consideration of the underlying circumstances
(5) mutuality
Mittenthal, *Past Practice and the Administration of Collective Bargaining Agreements*, in Arbitration and Public Policy 30 (S. Pollard ed. 1961); Gilman, *Past Practice in the Administration of Collective Bargaining Agreements in Arbitration*, 4 Suffolk L.Rev. 688 (1970); Treece, *Past Practice and its Relationship to Specific Contract Language in the Arbitration of Grievance Disputes*, 40 U.Colo.L.Rev. 358 (1968).

The County thereafter moved the district court to vacate the arbitrator's award on the ground that the arbitrator exceeded his powers. By order dated March 6, 1980, the district court vacated the award, stating:

The express terms of the contract very clearly evidence the mutual intention of the parties. It seems to this court that the arbitrator was clearly beyond his powers when he made the award in question. The express terms of the agreement must provide the basis for the award and the arbitrator only had authority to interpret and apply the contract and not to change its terms. For the court to hold otherwise would jeopardize the integrity of all future negotiations between the parties.

Initially, it should be emphasized that this case does not involve the arbitrability of the dispute. We are not asked to decide whether the arbitrator had the power or jurisdiction to hear the grievance in question. The parties stipulated that the grievance was properly before the arbitrator for decision.

The sole issue before this court on appeal is: did the arbitrator exceed his powers within the meaning of Minn.Stat. § 572.19, subd. 1(3) (1980) in issuing an award based upon the past practice of the parties where the practice conflicts with the clear and unambiguous language of the parties' written agreement?

We answer the question in the negative and accordingly reverse the district court.

The Uniform Arbitration Act, Minn.Stat. §§ 572.08–.30 (1980) governs the authority and procedure for judicial interference with the arbitration process under either a private sector or public sector collective bar-

gaining agreement containing an arbitration clause unless otherwise provided in the agreement. *State v. Berthiaume*, 259 N.W.2d 904, 909 (Minn.1977); *Minnesota Education Association v. Independent School District No. 495*, 290 N.W.2d 627, 629 (Minn.1980). Under the Act, courts are empowered to vacate an arbitrator's award only on the grounds specified in section 572.19, subd. 1(3).[4] Among the grounds justifying vacation of an award is when the arbitrator exceeds his powers.

We have consistently recognized that the Uniform Act is to be liberally interpreted and applied, noting that its basic intent is " * * * to discourage litigation and to foster speedy, informal and relatively inexpensive procedures for the voluntary resolution of disputes in a forum created, controlled, and administered by the written arbitration agreement." *Dunshee v. State Farm Mutual Auto. Ins. Co.*, 303 Minn. 473, 481, 228 N.W.2d 567, 572 (1975) *quoted in State v. Berthiaume*, 259 N.W.2d 904, 909 (Minn. 1980) and *Minnesota Education Association v. Independent School District No. 495*, 290 N.W.2d 627, 629 (Minn.1980). *See also Layne-Minnesota Co. v. Regents of the University of Minnesota*, 266 Minn. 284, 123 N.W.2d 371 (1963).

Consistent with the policy of fostering arbitration of labor disputes, judicial intervention has been carefully circumscribed by this court. In reviewing arbitration awards, we stated:

The scope of the arbitrators' powers is a matter of contract to be determined from the reading of the parties' arbitration agreement, and an arbitrators' award will be set aside by the courts only when the

4. Minn.Stat. § 572.19 (1980) provides in part:
Subdivision 1. Upon application of a party, the court shall vacate an award where:
(1) The award was procured by corruption, fraud or other undue means;
(2) There was evident partiality by an arbitrator as a neutral or corruption in any of the arbitrators or misconduct prejudicing the rights of any party;
(3) The arbitrators exceeded their powers;
(4) The arbitrators refused to postpone the hearing upon sufficient cause being shown therefor or refused to hear evidence material

to the controversy or otherwise so conducted the hearing, contrary to the provisions of section 572.12, as to prejudice substantially the rights of a party; or
(5) There was no arbitration agreement and the issue was not adversely determined in the proceedings under section 572.09 and the party did not participate in the arbitration hearing without raising the objection.
But the fact that the relief was such that it could not or would not be granted by a court of law or equity is not ground for vacating or refusing to confirm the award.

objecting party meets its burden of proof that the arbitrators have clearly exceeded the powers granted to them in the arbitration agreement; courts will not overturn an award merely because they may disagree with the arbitrators' decision on the merits.

*Children's Hospital, Inc. v. Minnesota Nurses Association,* 265 N.W.2d 649, 652 (Minn. 1978); *See State v. Berthiaume,* 259 N.W.2d 904, 910 (Minn.1977).

■ Thus, it is well settled under Minnesota law that once arbitrability is established, the role of the judiciary does not encompass a re-examination of the merits of the case. We have not, however, delineated the limits of arbitral authority in deciding a dispute nor at what point it can be said with assurance that an arbitrator has clearly exceeded those limits.

■ The principles established by the United States Supreme Court in the famed *"Steelworkers* Trilogy" are instructive. *United Steelworkers v. American Manufacturing Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). Judicial review of arbitration awards is similarly circumscribed under federal law. As stated in *Enterprise Wheel*:

> [T]he question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his.

*Id.* at 599, 80 S.Ct. at 1362. The power of the arbitrator is not, however, without limit; the award must draw its "essence" from the contract.

> [A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial jus-

tice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

*Id.* at 597, 80 S.Ct. at 1361.

The question before this court is therefore quite narrow: does the instant arbitration award meet the so-called "essence" test or does it manifest no more than the arbitrator's personal notion of justice? The difficulty of the inquiry is evident in the elusive nature of the applicable standard. A review of the decisions in the area substantiates the observation of the Court of Appeals for the Third Circuit that the cases have not "exuded uniformity in translating the 'essence' test into a pronouncement of the appropriate extent or limitation of judicial review of the arbitrator's interpretation." *Ludwig Honold Manufacturing Co. v. Fletcher,* 405 F.2d 1123, 1126 (3rd Cir. 1969).

■ The "essence of the collective bargaining agreement" must be considered in light of the Supreme Court's recognition in *Warrior & Gulf* that an arbitrator plays a unique role in administration of the collective bargaining agreement. That role necessarily entails a consideration of aspects of the parties' relationship which are not typically cognizable in a court of law.

> The labor arbitrator performs functions which are not normal to the courts; the considerations which help him fashion judgments may indeed be foreign to the competence of courts:
>
> > "A proper conception of the arbitrator's function is basic. He is not a public tribunal imposed upon the parties by superior authority which the parties are obliged to accept. He has no general charter to administer justice for a community which transcends the parties. He is rather part of a system of self-government created by and confined to the parties * * *." (citation omitted.)

The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it. *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 581–82, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960). Furthermore, insofar as the contract permits, an arbitrator is entitled to consider "such factors as the effect upon the productivity of a particular result, its consequences to the morale of the shop, his judgment whether tensions will be heightened or diminished." *Id.* at 582, 80 S.Ct. at 1353.

The "*Steelworkers* Trilogy" is based upon the underlying recognition that a collective bargaining agreement is not an ordinary contract; "it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate." *Id.* at 578, 80 S.Ct. at 1351. The source of rules governing the "community of the industrial plant" cannot be restricted to the words of the contract but must be considered in light of the "common law of the shop which implements and furnishes the context of the agreement." *Id.* at 580, 80 S.Ct. at 1351, *quoting* Cox, *Reflections Upon Labor Arbitration*, 72 Harv.L.Rev. 1482, 1499 (1959). The establishment of a system of "industrial self-government" is the object of a collective bargaining agreement and the grievance machinery is at the very heart of that system. *Id.* at 581, 80 S.Ct. at 1352.

■ The arbitrator plays a key role in the continuing interaction between and among the citizens of the industrial community. In resolving industrial strife, his function is to ascertain the parties' intended standard of behavior. Certainly the ex-

press provisions of the contract evidence this intent. The contract is not, however, the sole evidence of the parties' will; the conduct of the parties is likewise indicative of their mutual intent. *See United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). Therefore, the question before an arbitrator faced with conflicting contractual language and practice is basically an evidentiary one, focusing on "which evidence is most persuasive and therefore controlling, and not on whether the practice should be considered at all." Treece, *Past Practice and Its Relationship to Specific Contract Language in the Arbitration of Grievance Disputes*, 40 U.Colo.L. Rev. 358, 374 (1968). To hold otherwise is to completely ignore what the Supreme Court considers an integral part of the parties' agreement.

■ The district court erroneously utilized conventional contract principles in finding that the best evidence of the parties' intentions was manifested by the words which the parties themselves employed to express their intent. As the vacation schedule was free from ambiguity and purportedly applied to all employees in the bargaining unit, the district court essentially concluded that there was no need to resort to interpretive aids such as past practice.[5] Accordingly, it was held that the arbitrator impermissibly changed the contract, contrary to the express limitations of his authority.[6]

That the use of past practice may not add to or otherwise modify the express written agreement of the parties is followed by at least one court. In *Torrington Co. v. Metal Products Workers Union Local 1645*, 362 F.2d 677 (2d Cir. 1966), an arbitrator found that a longstanding policy regarding paid leave for voting purposes could be terminated only by mutual agreement. The con-

5. The traditional view that past practice may not be considered when the contractual language is clear and unambiguous has been soundly criticized by the commentators. *See generally* Mittenthal; Treece, Gilman, *supra*, n.3.

6. Article XV, section 15 of the agreement states in pertinent part:

(a) The arbitrator shall have no right to amend, modify, nullify, ignore, add to, or subtract from the terms and conditions of the contract. * * *.
(b) * * *. The decision shall be based solely on the arbitrator's interpretation or application of the express terms of this Agreement and to the facts of the grievance presented.

tract was silent on the matter and contained a similar no "additions or modifications" clause to the one at bar. A divided Court of Appeals refused to enforce the award on the ground that the arbitrator exceeded his power by expanding the express terms of the contract on the basis of the parties' prior practice. *Id.* at 682. The result in *Torrington*, however, has been widely criticized by the commentators [7] and for the most part rejected by other courts. *See, e. g., Sergeant Bluff-Luton Educational Association v. Sergeant Bluff-Luton Community School District*, 282 N.W.2d 144, 149–50 (Iowa 1979); *Jacinto v. Egan*, R.I., 391 A.2d 1173, 1177 (1978) and cases cited therein.

Although contrary to the literal words contained in the written agreement, in *General Teamsters Local 249 v. Potter-McCune Co.*, 412 F.Supp. 8 (D.Pa.1976) the court upheld an arbitrator's award based upon the past practice of the parties. The union there attacked the award on the ground that the arbitrator refused to enforce the admittedly plain and unambiguous language of the contract. The Court rejected the union's contention that the award failed to draw its "essence" from the contract, noting that:

> a standard involving no more than a strict comparison [of the award and the literal contract terms] would not only reduce the arbitrator to a mere cipher, approaching his task blinded to all save the express terms of the contract and stripped of the opportunity to utilize his special knowledge of the shop and industry, it would also obviate any need for anything like the "essence test" * * *.

*Id.* at 11–12.

This Court agrees that a simple comparison of the contractual language with the disputed award is inappropriate. The approach utilized by the Court in *Torrington* effectively negates an arbitrator's power to consider the practices of the shop as authorized by *Warrior & Gulf*.[8] We believe the "essence" test as interpreted in *Amoco Oil Co. v. Oil, Chemical and Atomic Workers*, 548 F.2d 1288 (7th Cir. 1977), *cert. denied*, 431 U.S. 905, 97 S.Ct. 1697, 52 L.Ed.2d 389 (1977), is more consistent with the underlying rationale of the Trilogy cases:

> An arbitrator's award does "draw its essence from the collective bargaining agreement" so long as the interpretation can in some rational manner be derived from the agreement, "viewed in the light of its language, its context, and any other indicia of the parties' intention; only where there is a manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop, may a reviewing court disturb the award." Neither the correctness of the arbitrator's conclusion nor the propriety of his reasoning is relevant to a reviewing court, so long as his award complies with the aforementioned standards to be applied by the reviewing court in exercising its limited function.

*Id.* at 1294. *Accord, Ludwig Honold Manufacturing Co. v. Fletcher*, 405 F.2d 1123, 1128 (3d Cir. 1969).

▉ Applying this test to the instant case, we are unpersuaded that the award failed to draw its essence from the collective bargaining agreement or otherwise evinced a manifest disregard of that agreement.[9] Rather than dispensing his own

---

**7.** *See e. g.* Kaden, *Judges and Arbitrators: Observations on the Scope of Judicial Review*, 80 Colum.L.Rev. 267, 272–273 (1980); Aaron, *Judicial Intervention in Labor Arbitration*, 20 Stan.L.Rev. 41 (1967).

**8.** Mittenthal, *supra*, n. 3, indicates that past practice may be used by the arbitrator as an interpretive aid in at least four situations:

(1) to clarify what is ambiguous

(2) to give substance to what is general

(3) to modify or amend what is seemingly unambiguous

(4) to establish a separate, enforceable condition of employment which cannot be derived from the express language of the agreement.

*Id.* at 30.

**9.** The fact that the arbitrator did not specifically find that the parties orally agreed to a different vacation schedule for the six appraisers is not crucial to the union's case. As succinctly

brand of justice the arbitrator clearly drew upon permissible evidence of the parties' mutually intended standard of behavior in resolving the dispute. In addition to the express contractual language, the arbitrator was entitled to consider the past practice of the parties,[10] conversations which took place prior to the negotiation of the collective bargaining agreement and the effect upon employee morale. In his judgment, those considerations outweighed the evidence of the parties' intent as manifested by their written words.

█ Having concluded that the award at issue meets the essence test, the fact that we may or may not agree with the arbitrator's decision is of no consequence. It was the arbitrator's construction of the parties' agreement which was bargained for; not the interpretation of this court.

█ In light of our decision, it is apparent that the broad "no additions or modifications" clause contained in the written agreement does not prevent enforcement of the award. The arbitrator in the case at bar did not change the contractual language solely on the basis of his own personal, extracontractual judgment. Rather he looked to the mutual intent of the parties as evidenced by their bargaining history and past practice. Therefore, the instant award, although based upon the arbitrator's subjective analysis, is supported by the actual intent of the parties rather than on what the arbitrator personally conceived as a just result. Faced with substantially similar provisions, courts have upheld awards based upon past practices which seemingly conflict with, or modify, the express provisions of the parties' written agreement.

See, e. g., Sergeant Bluff-Luton Educational Association v. Sergeant Bluff-Luton Community School District, 282 N.W.2d 144 (Iowa 1979); Cape Cod Gas Co. v. United Steelworkers of America, Local 13507, 3 Mass.App. 258, 327 N.E.2d 748 (1975) and cases cited therein; Rochester City School District v. Rochester Teachers Association, 41 N.Y.2d 578, 394 N.Y.S.2d 179, 362 N.E.2d 977 (1977); Jacinto v. Egan, R.I., 391 A.2d 1173 (1978).

We therefore hold that the arbitrator did not exceed his powers within the meaning of Minn.Stat. § 572.19, subd. 1(3) (1980) as the award is rationally derived from the collective bargaining agreement viewed in light of its language, its context and other indicia of the parties' intent, including past practice. If arbitration is to remain a viable alternative to problem resolution in the area of industrial strife, the concept of judicial deference to arbitral authority must encompass the recognition that the arbitrator is the "reader" of the contract. As the parties' chosen "reader," he is authorized to consider matters outside the written agreement in resolving disputes arising out of the continuing employment relationship. So long as an arbitrator's decision meets the standards enunciated herein, the courts will not interfere with that decision. Accordingly, the district court order is reversed and this cause is remanded with instructions to reinstate the arbitration award.

PETERSON, Justice (dissenting).

I respectfully dissent. The majority opinion relies on concepts of "common law of the shop" and "past practice" which are completely inapplicable to the case at bar.

noted by one commentator, "[T]he form the agreement takes is not important. Whether it be a formal writing, an oral understanding, or a longstanding practice, so long as each is supported by mutuality, the parties have indeed chosen to change their contract." Mittenthal, supra n.3, at 43.

10. The County alleged that it had mistakenly allowed the six appraisers to continue to accrue vacation time under the Administrative Vacation Plan. It is true that no evidentiary significance should be accorded a prior course

of conduct unless the party knew of its existence. However, acceptability may be inferred from less than actual knowledge under circumstances which indicate the party should have been aware of the prior course of conduct. Rarely is a past practice clear, detailed and undisputed. Whether the evidence is sufficient to show that a particular course of conduct is the mutually accepted and proper response under the circumstances is a question for the arbitrator, not the courts.

By misconstruing the role of these principles in contract interpretation, the majority opinion gives the arbitrator the absolute authority to rewrite the unambiguous provisions of the contract in order to achieve a result contrary to that expressly bargained for by the parties to the collective bargaining agreement.

The issue in this case is, indeed, a narrow one: Whether the arbitrator, by his award, clearly exceeded the powers conferred upon him by the plain language of the parties' collective bargaining agreement.

The majority opinion, setting the stage for a different result, frames the issue in these terms:

> The sole issue before this court on appeal is: did the arbitrator exceed his powers within the meaning of Minn.Stat. § 572.10, subd. 1(3) (1980) in issuing an award based upon the past practice of the parties where the practice conflicts with the clear and unambiguous language of the parties' written agreement?[1]

The trial court, in vacating the award of the arbitrator, noted that "[t]he expressed terms of the contract very clearly evidence the mutual intention of the parties" and that "the arbitrator was clearly beyond his power when he made the award in question." The trial court observed, moreover, that "to hold otherwise would jeopardize the integrity of all future negotiations between the parties." I fully agree with the trial court and would affirm.

The majority opinion, as did the arbitrator, acknowledges that "the contractual language at issue [is] clear and unequivocal on its face" but holds that "[t]he district court erroneously utilized conventional contract principles in finding that the best evidence of the parties' intentions was manifested by the words which the parties themselves employed to express their intent." The majority indulges in a dubious search for the "essence" of the contract, and, not recognizing the inappropriate use of past practice in this case, discards the "traditional view that past practice may not be considered when the contractual language is clear and unambiguous." This rationalization of an extraordinary result is destructive of the collective bargaining process and contributes to distrust of the arbitration process as an alternative to the judicial process. While today this result inures to the benefit of a small segment of employees in the large collective bargaining unit, it is a precedent that tomorrow may operate to the detriment of employees unable to rely upon explicit provisions of their bargaining agreement.[2]

Both the majority opinion and this dissenting opinion must start at the same point: The language of the collective bargaining agreement which the statement of the grievance claims was violated. First, Article X provides for the vacation sched-

---

1. The issue is even more narrow than those stated above, for there is really no issue as to whether the six employees should be entitled to the claimed vacation time for the period prior to March 1979 (at which time the county discovered its administrative clerical error), for the county appears to concede, and I would hold, that an arbitrator could find the county estopped from depriving the employees of the claimed vacation time up to that point. These employees had, because of the county's error, been precluded from putting in for overtime as authorized under the collective bargaining agreement in lieu of the prior accrual of vacation time without overtime. The arbitrator went further, however, and "grandfathered" them permanently under the prior administration's vacation plan, notwithstanding that the new collective bargaining agreement, by its terms, plainly applied to all employees. Protecting the employees from the adverse result

of the employer's own error is distinctly different from treating it as a permanent exception to the collective bargaining agreement, as if it were a past practice determinative of the intent of the collective bargaining itself.

2. The arbitrator noted but did not decide a claim of the bargaining representative that at the time of making the agreement the parties had agreed to "grandfather" these six employees. Had the arbitrator found that as a fact, of course, there would be no issue, for *that* would itself constitute an express term of the collective bargaining agreement. The arbitrator understandably did not make a finding of fact on that point, however, quite probably because the county employer denied any such oral agreement and because it would be unusual not to reduce such an agreement to writing.

ule, the meaning of which is not in dispute.[3] Second, Article 1, Section 1.2, provides that "all personnel policies provided by this contract, *unless otherwise stated, should be applied uniformly across the entire bargaining unit*" (emphasis supplied). Third, the arbitrator's authority, in a dispute concerning vacation entitlement, is limited by the terms of section 15.4:

(a) *The arbitrator shall have no right to amend, modify, nullify, ignore, add to, or subtract from the terms and conditions of the contract.* The arbitrator shall consider and decide only the specific issue(s) submitted in writing by the County and the employee and the Union, and shall have no authority to make a decision on any other issue not so submitted.

(b) The arbitrator's decision shall be submitted in writing within thirty (30) days following close of the hearing or the submission of briefs, by the parties, whichever be later, unless the parties agree to an extension. *The decision shall be based solely on the arbitrator's interpretation or application of the express terms of this Agreement and to the facts of the grievance presented.*

(Emphasis added.) The majority opinion does not stop there, however, but holds that the arbitrator properly and authoritatively determined that the "essence" of the contract gave its explicit language contrary meaning and that the county's administrative error was an interpretative past practice which carves out an exception for these six, only, of the Real Estate Appraisers III.

3. It differed from the pre-contract vacation agreement by providing fewer days of vacation than formerly but granting overtime compensation at a rate of time and one-half for all work performed in excess of the normal workday or workweek (the former plan having limited overtime to a straight time basis and only when authorized).

4. We held in *State v. Berthiaume*, 259 N.W.2d 904 (Minn.1977), that the Act applies to public sector collective bargaining agreements containing an arbitration clause.

5. This is especially true in labor disputes in the public sector which involve state, county, and

The Uniform Arbitration Act, Minn.Stat. § 572.19, subd. 1 (1980), provides that "the court shall vacate an award where * * * (3) [t]he arbitrators exceeded their powers."[4] The scope of the arbitrator's powers is a matter of contract to be determined from the reading of the parties' arbitration agreement, *Children's Hospital, Inc. v. Minnesota Nurses Association*, 265 N.W.2d 649, 652 (Minn.1978), and whether arbitral authority, circumscribed by the collective bargaining agreement, clearly has exceeded those bounds is a matter for judicial resolution.[5] *City of Bloomington v. Local No. 2828, AFSCME*, 290 N.W.2d 598, 602 (Minn. 1980). The arbitrator's decision should not, thus, be considered as totally insulated from judicial review.

Although an arbitrator has considerable latitude in construing collective bargaining agreements, his powers should not be considered unlimited. He derives his authority from and is bound by the terms of the contract. The arbitrator's role is restricted to that of contract reader; it does not give him a free hand to rewrite the parties' agreement. St. Antoine, *Judicial Review of Labor Arbitration Awards: A Second Look at Enterprise Wheel and its Progeny*, 75 Mich.L.Rev. 1137, 1140 (1977); Kagel, *Recent Supreme Court Decisions and the Arbitration Process* in *Arbitration and Public Policy* (S. Pollard ed. 1961). An arbitrator exceeds the bounds of his authority when he attempts to modify the agreement to contradict what the parties have contemplated and consented to in the collective bargaining process.

municipal employees. As Justice Weisberger commented in his dissent in *Jacinto v. Egan*, R.I.,391 A.2d 1173, 1181 (1978):

If this court should choose to abdicate from any meaningful function in the review of such determinations, the practical enforcement of a large body of public law would be left to the untrammeled and unreviewable discretion of arbitrators. I think that the interest of the people of this state in the enforcement and application of laws ... is far too compelling in nature to warrant such abstention on our part.

The United States Supreme Court, like other federal appellate courts and our court, has recognized that arbitration is a preferred method for the resolution of disputes involving collective bargaining agreements, but that the arbitrator has no carte blanche to disregard the contractual limits on his authority. As Justice Douglas noted in *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960):

> When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations. The draftsmen may never have thought of what specific remedy should be awarded to meet a particular contingency. *Nevertheless, an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice.* He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

*Id.* at 597, 80 S.Ct. at 1361 (emphasis added). Consequently, an arbitrator's award will not be upheld when it contravenes the express language of the labor contract. *Mistletoe Express Service v. Motor Expressman's Union*, 566 F.2d 692, 695 (10th Cir. 1977).[6]

Further, courts should not enforce an award which binds the parties to the arbitrator's concept of industrial common law without their consent. The agreement itself must be considered as the product of much of the common law of the industry or plant. Kagel, *supra*, at 7. Allowing the arbitrator to speculate as to what rules of the shop the parties possibly could have agreed to would destroy the policy of industrial stability underlying the bargaining process. The arbitrator is accordingly limited to administering the rule of law established by the collective bargaining agreement. Shulman, *Reason, Contract, and Law in Labor Relations*, 68 Harv.L.Rev. 999, 1016 (1955).

Even under the expansive view of arbitration advocated by Justice Douglas in the *Steelworker's* trilogy, common law cannot be introduced when it is contrary to the plain words of the agreement.[7] *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 579–80, 80 S.Ct. 1347, 1351, 4 L.Ed.2d 1409 (1960). To hold otherwise would elevate the arbitrator's vague notion of an unwritten law of the shop above the definite set of rules which results from the parties' efforts in the labor negotiations.

A federal court decision most nearly in point, factually, with the case at bar is *Torrington Co. v. Metal Products Workers Union Local 1645*, 362 F.2d 677 (2d Cir. 1966), which affirmed a trial court decision setting aside an arbitrator's award based, as here, upon past practice pre-existing the negotiation of the collective bargaining agreement. The private employer had a 20-year policy of permitting employees time

---

**6.** *See also Fabricut, Inc. v. Tulsa Gen. Drivers, Warehousemen and Helpers, Local 523*, 597 F.2d 227 (10th Cir. 1979); *Detroit Coil Co. v. Int'l Ass'n of Machinists Lodge 82*, 594 F.2d 575 (6th Cir.), *cert. denied*, 444 U.S. 840, 100 S.Ct. 79, 62 L.Ed.2d 52 (1979); *Amanda Bent Bolt Co. v. U. A. W. Local 1549*, 451 F.2d 1277 (6th Cir. 1971); *Local 342, United Auto., Aerospace & Agricultural Implement Workers v. T. R. W., Inc.*, 402 F.2d 727 (6th Cir. 1968), *cert. denied*, 395 U.S. 910, 89 S.Ct. 1742, 23 L.Ed.2d 223 (1969); *Torrington Co. v. Metal Products*

*Workers Union Local 1645*, 362 F.2d 677 (2d Cir. 1966).

**7.** Dean Theodore St. Antoine has commented that:

> Labor arbitration as we know it is not the product of the intellectualizing of the National Academy, nor even of the mythologizing of Justice Douglas. It is the product of contract—or, more precisely, the product of the *particular* contracts of *particular* parties.

St. Antoine, *supra*, at 1139 (footnote omitted).

off to vote on election days, a policy that had been unilaterally instituted by the company. The employer, in negotiations, had declared that it would discontinue the policy, to which the union objected, but the contract was silent on the subject. The contract provided, as here, that "[t]he arbitrator shall be bound by and must comply with all the terms of this agreement and he shall have no power to add to, delete from, or modify, in any way, any of the provisions of this agreement." *Id.* at 678 n. 2.

The arbitrator ruled that the benefit of paid time off to vote was a firmly established practice of the company and that it therefore had the burden of changing this policy by negotiating with the union since such a provision was implied by the prior practice of the parties. Chief Judge Lumbard, writing for the majority of the court, said:

> [W]hile courts should be wary of rejecting the arbitrator's interpretation of the implications of the parties' prior practice, the mandate that the arbitrator stay within the confines of the collective bargaining agreement * * * requires a reviewing court to pass upon whether the agreement authorizes the arbitrator to expand its express terms on the basis of the parties' prior practice.
>
>   *   *   *   *   *   *
>
> Far from having the disruptive effect upon the finality of labor arbitration which results when courts review the "merits" of a particular remedy devised by an arbitrator, we think that the limited review exercised here will stimulate voluntary resort to labor arbitration and thereby strengthen this important aspect of labor-management relations by guaranteeing to the parties to a collective bargaining agreement that they will find in the arbitrator not a "philosopher king" but one who will resolve their disputes within the framework of the agreement which they negotiated.

362 F.2d at 680, 682.

The gist of the majority opinion's rationale is that "past practice" affords meaning to the contract, notwithstanding the plain meaning of its words—not generally, but as to six employees. I submit two responses to this rationale. First, a "practice" is not, as here, mere inadvertence, an administrative mistake promptly corrected when discovered. Second, "past practice" is properly utilized only to construe provisions of an agreement that may be rationally considered ambiguous; it cannot be applied to this contract, in which the language is unambiguous.

For a "past practice" to exist, two basic elements are required: (1) a prior course of conduct; and (2) an understanding by the parties that such conduct is the proper response to the circumstances. Treece, *Past Practice and its Relationship to Specific Contract Language in the Arbitration of Grievance Disputes*, 40 U.Colo.L.Rev. 358, 363, 365 (1968); Mittenthal, *Past Practice and the Administration of Collective Bargaining Agreements*, in *Arbitration and Public Policy*, 31 (S. Pollard ed. 1961). Not only must it be demonstrated that clear and consistent conduct has been developed over a period of time, but it must also be shown that the conduct was known and mutually accepted by the parties. Treece, *supra*, at 365; Mittenthal, *supra*, at 32. This requirement of mutuality is a crucial standard since past practice should prevail only if the proof indicates that there was mutual agreement. Treece, *supra*, at 365; Mittenthal, *supra,* at 32; Hogan, *Discussion in Arbitration and Public Policy*, 64 (S. Pollard ed. 1961).

Past practice only exists in a situation in which both parties can be deemed to have assented to the practice. *Nickles Bakery, Inc.*, 33 Lab.Arb. 564, 566 (1959). If the conduct was initially a mistake, there can be no mutually established rule. Treece, *supra*, at 365. Further, the failure to enforce a contractual provision destroys neither the contract right nor the right to enforce it. Hogan, *supra*, at 65–68. The right still controls despite the fact that the company has not chosen to enforce rigidly the contractual provisions. *Id.* Consequently, a party cannot unilaterally modify the collective bargaining agreement nor can

it take advantage of the failure to enforce the contractual obligation.

No evidence was introduced in this case indicating that the county had actual knowledge of the practice of the six employees other than the possible claim that such knowledge should be inferred from the continuing violation of the agreement. Although there may have originally been mutual acceptance of the employees' vacation practice, there was no mutual agreement to continue informally the past vacation policy under the new contract. The county did not acquiesce in the continuance of the practice nor did it "ignore" the conduct. Once the county had notice of the practice, it responded promptly.

As the majority opinion notes: "[i]t is true that no evidentiary significance should be accorded a prior course of conduct unless the parties knew of its existence." There surely is no common law of the shop when it is not recognized as such by the parties. The majority opinion is in effect holding that it is impossible to correct a manifest mistake.[8]

Even if the conduct of the six employees could be considered a past practice, evidence of such practice could not be introduced to contradict the express terms of the collective bargaining agreement. It is generally acknowledged that past practice may be utilized in construing provisions of the agreement that may rationally be considered ambiguous, *Boise Cascade v. United Steelworkers, Local Union No. 7001*, 588 F.2d 127 (5th Cir.), *cert. denied*, 444 U.S. 830, 100 S.Ct. 57, 62 L.Ed.2d 38 (1979), or in filling "gaps" in the contract, *United Steelworkers v. Warrior & Gulf Navigation Co.*, *supra*, at 580, 80 S.Ct. at 1351. However, past practice may not be used to vary or contradict unambiguous provisions of the contract. *See, e. g., Sun Rubber Co.*, 28 Lab.Arb. 362, 368 (1957); *Price-Pfister*

*Brass Mfg. Co.*, 25 Lab.Arb. 398, 404 (1955); *Bethlehem Steel Co.*, 21 Lab.Arb. 579, 582 (1953); Treece, *supra*, at 369–79, 372; Hogan, *supra*, at 64. If the language of the agreement is clear, precise, and not subject to various interpretations, past conduct is not relevant in determining the meaning of the agreement. *Schmutz Mfg. Co., Inc.*, 31 Lab.Arb. 701, 704 (1958).

When the past practice of a party conflicts with the language of the contract, the latter should prevail. *Id. See* Mittenthal, *supra*, at 40. As Dean Harry Shulman observed in a decision he made as umpire:

> A contrary holding would place past practice on a par with written agreement and create the anomaly that, while the parties expend great energy and time in negotiating the details of the Agreement, they unknowingly and unintentionally commit themselves to unstated and perhaps more important matters which in the future may be found to have been past practice.

*Ford Motor Co.*, 19 Lab.Arb. 237, 242 (1952). Thus, the arbitrator, whose authority is restricted to interpretation and application of the terms of a contract, exceeds those limits when he issues a decision based upon a recognition of a practice at variance with the specific language of the agreement. *Ohio Steel Foundry Co.*, 36 Lab.Arb. 1088 (1961). *See Reynolds Metals Co.*, 39 Lab. Arb. 730, 733 (1962).

The majority opinion notes that this well-established rule has been criticized by some commentators who believe that past practice should be utilized by the arbitrator even when the provisions of the contract are clear. Those critics, however, also reject the use of past practice if the contract is totally unambiguous and complete and if there was no mutual agreement by the par-

---

**8.** The arbitrator's opinion, unlike the majority opinion, did not rely on a theory of shop common law, the arbitrator resting exclusively on the theory of past practice. The arbitrator concluded with these words: "Finally, it does not stand to reason that the Grievants should now, in essence, be penalized for the 'oversight' which the County admitted 'could have been discovered by central personnel.'" To deprive them of benefits previously accrued by the six employees, as noted in footnote 1, may be a penalty—but to apply the contract in the future obviously is not.

ties to the practice. *See* Treece, *supra*, at 377.[9]

Arbitrator Richard Mittenthal, who advocates a broad use of past practice, concedes that there must be some uncertainty as to meaning or intention before prior conduct may be utilized to interpret a contract.[10] Mittenthal, *supra*, at 55. *See* Hogan, *supra*, at 64. He decided in *Wyandotte Chemical Corp.*, 39 Lab.Arb. 65 (1962), that a past management policy concerning work assignments was not a "past practice" which could be enforced since it was unsupported by mutual agreement. It was his conclusion that:

> To treat all practices as binding conditions * * * would be to place past practice on an equal footing with the written Agreement * * *. The arbitrator certainly has no authority to write a "past practice" clause into the Agreement under the guise of contract interpretation.

*Id.* at 67.

Further, in *Dana Corp.*, 41 Lab.Arb. 100 (1963), Mittenthal recognized that once parties have commented on the general subject of the past practice in the agreement, the implication of that practice can no longer be drawn. Applying that reasoning to the case at bar, it is clear that past practice should not have been used in reaching a decision since the agreement specifically dealt with the subject matter of the practice, vacation time and overtime payments.

Notwithstanding the explicit terms of the vacation provisions of the labor agreement, notwithstanding the explicit provision that "all personnel policies provided by this contract, unless otherwise stated, shall be applied uniformly across the entire bargaining unit," and notwithstanding the detailed contractual provisions proscribing it, the arbitrator modified the collective bargaining agreement to provide that it did not apply to these six employees and that their vacation entitlement would be on terms different from all other employees in the unit. Granting a special vacation entitlement exclusionary for these six employees, superior to that provided for all other employees in the unit—including other employees in the same classification of Real Estate Appraiser III—will hardly contribute to the "morale of the shop."

I respectfully dissent of my colleagues and would affirm the decision of the trial court.

OTIS, Justice (dissenting).

I join in the dissent of Mr. Justice Peterson.

---

**9.** Arbitrator Lawrence W. Treece has commented that no critic has decided to what degree past practice should be relied on when contract terms are ambiguous. Treece, *supra*, at 378. In Treece's opinion, the evidence that should be given more relative weight is that which reflects the parties' mutual intention. *Id.* at 374. Even under this approach, the conduct of the six employees would not be considered since it did not reflect a practice mutually agreed to by the parties.

**10.** Mittenthal admits that even those who are willing to use past practice in all decisions are apprehensive of the breadth of the implication. Mittenthal, *supra,* at 52. He also acknowledges that what may seem correct from a theoretical point of view does not always make sense from a practical point of view. *Id.*