In the Matter of a Petition for Determination of an Appropriate Unit and Certification as Exclusive Representative SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 284, SOUTH ST. PAUL, MINNESOTA, Respondent,

v.

UNIVERSITY OF MINNESOTA, UNIT 8, MINNEAPOLIS, MINNESOTA, Relator,

Bureau of Mediation Services, Respondent.

A16-1985

Court of Appeals of Minnesota.

Filed September 5, 2017

Brendan D. Cummins, Cummins & Cummins, LLP, Minneapolis, Minnesota (for respondent Service Employees International Union, Local 284).

Karen G. Schanfield, Krista A.P. Hatcher, Pari I. McGarraugh, Fredrikson & Byron P.A., Minneapolis, Minnesota; and Douglas R. Peterson, Shelley Carthen Watson, University of Minnesota, Minneapolis, Minnesota (for relator University of Minnesota, Unit 8, Minneapolis, Minnesota).

Lori Swanson, Attorney General, Caitlin M. Micko, Kelly S. Kemp, Assistant Attorneys General, St. Paul, Minnesota (for respondent Bureau of Mediation Services).

Margaret A. Luger-Nikolai, Nicole M. Blissenbach, David M. Aron, Education Minnesota, St. Paul, Minnesota (for amicus curiae Education Minnesota).

Jessica L. Roe, Shannon N.L. Cooper, Roe Law Group, PLLC, Minneapolis, Minnesota (for amicus curiae University of Minnesota Faculty Excellence).

Considered and decided by Reyes, Presiding Judge; Connolly, Judge; and Jesson, Judge.

## OPINION

JESSON, Judge

The legislature created 13 specific bargaining units for relator University of Minnesota in Minnesota Statutes section 179A.11, a portion of PELRA. This appeal centers on a dispute over which of the 13 bargaining units is appropriate for university employees classified as lecturers, senior lecturers, teaching specialists, and senior teaching specialists. The university contends that they are appropriately placed in the academic professional and administrative staff unit, Unit 11, while respondent union argues that, given their instructional duties, they should be assigned to the instructional unit, Unit 8. The union, Service Employees International, Local 284 (SEIU), seeks to represent the employees in Unit 8 and, in conjunction with that unionization effort, petitioned the Commissioner of the Bureau of Mediation Services (BMS) to assign them there. Finding that the lecturers and teaching specialists shared a community of interest with the employees in Unit 8 and that their occupational content had been significantly modified since the initial legislative unit configuration, BMS did so. The university challenges this unit-determination order in this certiorari appeal. Because the plain language of PELRA excludes the employees in these disputed classifications from Unit 8, and because the occupational job content of these employees have not been significantly modified, we conclude that BMS lacked the statutory authority to make this assignment. We therefore reverse.

## FACTS

In January 2016, respondent SEIU filed a petition with BMS seeking to represent employees in Unit 8, the Twin Cities Instructional Unit at the University of Minnesota. *See* Minn. Stat. § 179A.11, subd. 1(8) (defining Unit 8). In connection with that petition, the union also requested that BMS's commissioner assign to Unit 8 ten classifications of employees, including lecturer, senior lecturer, teaching specialist, and senior teaching specialist ("lecturers and teaching specialists" or the "disputed classifications").[1] It asserted that the commissioner was required to assign these

---

1. The other six classifications were extension professors and educators. BMS determined that these six classifications were not included in Unit 8 because most employees in those classifications were not located on the Twin Cities campus of the university. *See* Minn. Stat. § 179A.11, subd. 1(8).

classifications to the appropriate bargaining unit because they had not been previously assigned, or that, even if they had previously been assigned, their occupational content had been significantly modified. *See* Minn. Stat. § 179A.10, subd. 4. The union further contended that Unit 8 was the appropriate bargaining unit because the lecturers and teaching specialists shared a community of interest with the employees in that unit. *See id.* The university, however, objected to the proposed assignment of the lecturers and teaching specialists to Unit 8, arguing that the statutory list of positions for Unit 8 did not include these classifications because they lacked academic rank, *see* Minn. Stat. § 179A.11, subd. 1(8), and as a result the lecturers and teaching specialists were necessarily assigned to Unit 11, the Academic Professional and Administrative Staff Unit. *See* Minn. Stat. §§ 179A.10, subd. 4; .11, subd. 1(11) (defining Unit 11).[2] Because these classifications were assigned by the legislature, the university maintained, the commissioner lacked authority to assign them to Unit 8.

In March 2016, BMS issued a pre-hearing order determining that the lecturers and teaching specialists had not been previously assigned pursuant to statute. It therefore concluded that the commissioner had authority to assign those classifications to bargaining units, and it ordered a hearing to determine the appropriate unit assignment for those positions. In September 2016, following a 13-day hearing, BMS issued an order expanding Unit 8 to include the disputed classifications. It found that, in 2005, the university had significantly modified the occupational content of the disputed classifications, reinforcing BMS's previous conclusion that the commissioner had authority to determine their unit assignment because they had not been previously assigned to a bargaining unit. *See* Minn. Stat. § 179A.10, subd. 4. BMS therefore examined the record and further determined that the disputed classifications shared a community of interest with the existing classifications in Unit 8. It then ordered that the disputed classifications be included in the Unit 8 bargaining unit. The university requested reconsideration, which was denied. This certiorari appeal follows.

## ISSUES

I. Did BMS have authority to assign the four disputed classifications to Unit 8 under Minnesota Statutes section 179A.10, subdivision 4, because they were not previously assigned?

II. If the disputed reclassifications were previously assigned, did BMS have the authority to reassign them because their occupational content had been significantly modified since their initial assignment?

## ANALYSIS

This case presents the issue of whether BMS had authority to assign the lecturers, senior lecturers, teaching specialists, and senior teaching specialists, to Unit 8, the Twin Cities Instructional Unit.[3]

---

**2.** A third unit, Unit 12, the Noninstructional Professional Unit, comprises civil service employees. *See* Minn. Stat. § 179A.11, subd. 1(12).

**3.** Although the university argues that BMS lacked "jurisdiction" to assign the disputed classifications to Unit 8, the university does not challenge BMS's power to determine the

general class of disputes before it. *Cf. McCullough & Sons, Inc. v. City of Vadnais Heights*, 883 N.W.2d 580, 584-85 (Minn. 2016) (stating that subject-matter jurisdiction refers to the court's power "to hear and determine a particular class of actions and the particular questions presented") (quotation omitted). Rather, the university challenges whether, by

In examining whether BMS had authority to assign the lecturers and teaching specialists, we address two issues. First, were the disputed classifications previously assigned by the legislature under PELRA? This is a legal question, turning on statutory interpretation, subject to de novo review. *In re Decertification of an Exclusive Representative Certain Emps. of Univ. of Minn., Unit 9*, 730 N.W.2d 300, 303 (Minn. App. 2007). Although we generally defer to an agency's expertise and knowledge in terms of the agency's technical training and experience, *In re Clarification of an Appropriate Unit*, 880 N.W.2d 383, 386 (Minn. App. 2016), appellate courts are not bound by an agency's interpretation of PELRA. *In re Decertification*, 730 N.W.2d at 303.

If we determine, as we do, that the legislature previously assigned the lecturers and teaching specialists to Unit 11, we turn to a second question: have these employee classifications been substantially modified since the initial assignment? This presents a factual issue, which is reviewed to determine whether substantial evidence supports the agency's decision. *See County of Scott v. Pub. Emp't Relations Bd.*, 461 N.W.2d 503, 506 (Minn. App. 1990), *review denied* (Minn. Dec. 20, 1999). "Substantial evidence is . . . such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Patzwald v. Pub. Emp't Relations Bd.*, 306 N.W.2d 118, 120 (Minn. 1981) (quotation omitted).

We review these two issues within the statutory framework of PELRA, which the Minnesota Legislature enacted in 1971 to promote constructive and orderly relationships between public employees and their employers. *See* Minn. Stat. § 179A.01; *Eisen v. State, Dep't of Pub. Welfare*, 352 N.W.2d 731, 735 (Minn. 1984). These public employees include those at the University of Minnesota.[4] *See* Minn. Stat. § 179A.11. And while PELRA grants the BMS commissioner broad authority to designate bargaining units for some public employees, PELRA itself sets forth the 13 bargaining units designated as "the appropriate units of University of Minnesota employees." *Id.*, subd. 1 (stating that "[t]he following are the appropriate units of [those] employees," and "[n]o additional units of [university] employees shall be recognized for the purpose of meeting and negotiating"). And it specifies the employee positions that are included in each of those units. *Id.*, subd. 1(1)-(13).[5]

Given that University-of-Minnesota employees are restricted to statutorily specified bargaining units, BMS does not have unlimited authority to assign employees to

the terms of the relevant statutes, it had authority to assign the disputed classifications to Unit 8 in this case.

4. In 1980, the United States Supreme Court held that the level of discretion and autonomy enjoyed by faculty at private universities removed them from the definition of employees in the National Labor Relations Act, 29 U.S.C. § 2(3). *NLRB v. Yeshiva University*, 444 U.S. 672, 673, 100 S.Ct. 856, 857-58, 63 L.Ed.2d 115 (1980). *See* Matthew M. Bodah, *Significant Labor & Employment Law Issues in Higher Education During the Past Decade and What to Look for Now: The Perspective of an Academician*, 29 J.L. & Educ. 317, 318 n.6 (2000). But faculty organizing in the public

sector, which is governed by state labor laws rather than the NLRA, has continued. *See id.* at 318. In over half the states, public university faculty have the right to unionize under public sector collective bargaining legislation, such as PELRA. Risa L. Lieberwitz, *Faculty in the Corporate University: Professional Identity, Law and Collective Action*, 16 Cornell J.L. & Pub. Pol'y 263, 266 n.4 (2007).

5. Although with differing amounts of specificity, PELRA likewise sets out the bargaining units for state and court employees. *See* Minn. Stat. §§ 179A.10 (setting forth units for state employees), .101 (stating units for court employees).

those bargaining units. Rather, PELRA states the conditions under which BMS may make such an assignment:

> The commissioner [of BMS] shall assign ... University of Minnesota employee classifications ... to the appropriate units when the classifications ... *have not been assigned* under ... section ... 179A.11 *or have been significantly modified in occupational content subsequent to assignment.* ... The assignment of the classes shall be made on the basis of the community of interest of the majority of employees in these classes with the employees within the statutory units.

Minn. Stat. § 179A.10, subd. 4 (emphasis added).

The two units at issue here are Unit 8, the Twin Cities Instructional Unit, and Unit 11, the Academic Professional and Administrative Staff Unit. Minn. Stat. § 179A.11, subd. 1(8), (11). By statute, Unit 8 "consists of the positions of all instructional employees with the rank of professor, associate professor, assistant professor, including research associate or instructor, including research fellow, located on the Twin Cities campuses." *Id.*, subd. 1(8). On the other hand, Unit 11 "consists of all academic professional and administrative staff positions that are not defined as included in an instructional unit, the supervisory unit, the clerical unit, or the technical unit." *Id.*, subd. 1(11).

As addressed below, we conclude that BMS did not have the authority to assign the teaching specialists and lecturers to Unit 8 because they were previously assigned and the occupational content of their classifications had not been significantly modified after that assignment. As a result, the disputed classifications appropriately reside in Unit 11.

**I. The plain language of section 179A.11, subdivision 1(8), read in conjunction with other portions of PELRA, places the disputed classifications in Unit 11, rather than Unit 8.**

BMS determined that, under PELRA, it had authority to assign the teaching specialists, senior teaching specialists, lecturers, and senior lecturers to Unit 8. To review this issue of statutory interpretation, we must ascertain legislative intent. Minn. Stat. § 645.16 (2016). In doing so, we first examine the plain meaning of the statute. *In re Clarification of an Appropriate Unit*, 529 N.W.2d 717, 719 (Minn. App. 1995), *review denied* (Minn. June 14, 1995). If a statute's meaning is plain, on its face and as applied to the facts of a case, the statute is unambiguous, and judicial construction is neither necessary nor proper. *Occhino v. Grover*, 640 N.W.2d 357, 359 (Minn. App. 2002), *review denied* (Minn. May 28, 2002). "Plain meaning presupposes the ordinary usage of words that are not technically used or statutorily defined ... and draws from the full-act context of the statutory provision." *Id.*; *see also Glen Paul Court Neighborhood Ass'n v. Paster*, 437 N.W.2d 52, 56 (Minn. 1989) (providing that sections of a statute must be read together to give words their plain meaning). In reviewing the contents of the statute, this court may "consider sections of a statute that relate to the same subject matter." *A.A.A. v. Minn. Dep't of Human Servs.*, 818 N.W.2d 552, 556 (Minn. App. 2012), *aff'd*, 832 N.W.2d 816 (Minn. 2013).

If a statute's language is ambiguous, however, we may look beyond its language to discern legislative intent. *Staab v. Diocese of St. Cloud*, 813 N.W.2d 68, 72-73 (Minn. 2012). Legislative intent may be gleaned from examining, among other considerations, the necessity and occasion for the law, the object to be attained, any former law on the same subject, the conse-

quences of a certain interpretation, contemporaneous legislative history, and legislative and administrative interpretations of the statute. Minn. Stat. § 645.16 (1)-(8).

At the outset, we observe that the plain language of the statute, subdivision 1(8), excludes the disputed classifications from the list of positions covered by Unit 8. *See* Minn. Stat. § 179A.11, subd. 1(8). The statute lists the following occupational classifications within that unit: the positions "with the *rank* of professor, associate professor, assistant professor, including research associate or instructor, including research fellow." *Id.* (emphasis added). Technical words and phrases in a statute are "'construed according to [their] special meaning or their definition.'" *Staab*, 813 N.W.2d at 72 (quoting Minn. Stat. § 645.08(1) (2010)). Here, the university faculty tenure code refers to rank of faculty members: "The faculty ranks are professor, associate professor, assistant professor, and instructor." University of Minnesota Faculty Tenure Code, § 3.1 (2011). In contrast, the faculty tenure code does not assign rank to the disputed classifications of lecturer, senior lecturer, teaching specialist, and senior teaching specialist. SEIU does not dispute that the term "rank" in the statute refers to academic rank.[6] Therefore, because the term "rank" is a specialized term, and because the disputed classifications do not have rank under the faculty tenure code, by the statute's plain language, they are not included in the list of positions assigned to bargaining Unit 8. *See* Minn. Stat. § 179A.11, subd. 1(8).

To discern the meaning of subdivision 1(8), we may also examine it in conjunction with other portions of the statute. Subdivision 1(11) plainly states that Unit 11 "consists of all academic professional and administrative staff positions that are not defined as included in an instructional [or other] unit." Minn. Stat. § 179A.11, subd. 1(11). Because the disputed classifications are academic professional positions that are not included in Unit 8 or any other unit, they are necessarily included in Unit 11. *See id.*; *Occhino*, 640 N.W.2d at 359.

SEIU argues that, because the title to subdivision 1(8) refers to an "instructional unit," employees in the disputed classifications, who are instructional employees, are necessarily included in Unit 8. *See* Minn. Stat. § 179A.11, subd. 1(8). The union contends that the specific classifications or "ranks" listed should not be viewed as an exclusive list, but rather should be read in conjunction with the BMS commissioner's broad authority to assign other instructional employees to a unit that explicitly includes "all instructional employees." *See id.* This argument is not supported by the overall statutory scheme or by the plain meaning of the statute itself.

In reviewing the overall statutory scheme, we note that the 1991 amendments to PELRA refute a reading that all instructional employees are designated for Unit 8. Rather, the record shows that the legislature split a previous noninstructional professional bargaining unit into the current Unit 11, the Academic Professional and Administrative Staff Unit, and a new Unit 12, the current Noninstructional Professional Unit, which includes civil service employees. *See* 1991 Minn. Laws ch. 77, at 165. The legislature, however, did not amend the portion of the statute assigning classifications to Unit 8, the Twin Cities

---

**6.** SEIU argues that, like the lecturers and teaching specialists, term faculty employees (who constitute less than 20% of Unit 8) are non-tenure faculty on renewable contracts. Term faculty include temporary and visiting faculty. But it is undisputed that term faculty hold academic rank. As a result, while similarities between term faculty and the lecturers and teaching specialists would be important in a community-of-interest analysis, this examination is not relevant here.

Instructional Unit. *See id.* The 1991 assignments are still effective, so that the present effective statutory scheme includes an instructional unit, a noninstructional unit, and a third unit, *which may contain both instructional and noninstructional employees. See* Minn. Stat. § 179A.11, subd. 1(8), (11), (12). This structure of the legislatively assigned bargaining units does not support the union's argument that instructional employees necessarily fall within the scope of Unit 8. Rather, it supports our conclusion that academic and professional instructional staff who are not faculty members and are also not civil service employees are plainly designated for Unit 11. *See id.* And because the clear language of subdivision 1(8) indicates that academic rank is required for inclusion in Unit 8, the fact that all the employees in Unit 8 are instructional employees does not mean that all instructional employees at the university are properly assigned to that unit. *See id.*

Further, although the plain language of the statute, which requires academic rank for inclusion in Unit 8, dictates our conclusion, even if we viewed the language as ambiguous, both canons of statutory construction and legislative history would lead us to the same result. Canons of statutory construction inform us that when a specific statutory provision appears to contradict a general provision, the specific provision controls within its scope of application. Minn. Stat. § 645.26 (2016). And this court does not interpret a statute in a way that would render portions of a the statute meaningless. *See* Minn. Stat. § 645.17 (2016) (stating that courts presume that the legislature "intends the entire statute to be effective and certain"). Here, the specific provision referring to "rank" con-

trols over the more general provision referring to "all instructional employees." *See* Minn. Stat. § 179A.11, subd. 1(8). And reading the statute to apply as a blanket matter to "all instructional employees," without reference to rank, which the union urges us to do, would render the additional statutory language referring to "rank" meaningless. *See id.*

In addition, the legislative history of Minnesota Statutes section 179A.11 supports a determination that the disputed classifications have been previously assigned. *See, e.g., AFSCME Council No. 14 v. Washington Cnty. Bd. of Comm'rs,* 527 N.W.2d 127, 132 (Minn. App. 1995) (examining legislative history to interpret PELRA). The record reflects that in 1981, when university bargaining units were first assigned, the university submitted a petition to the director of BMS with a proposed list of employee classifications to be included in Unit 11, the then "noninstructional professional" unit. That list included the classifications of lecturer and teaching specialist.[7] SEIU argues that the submission of this list does not demonstrate that the BMS director approved the classifications on the list for Unit 11. But SEIU has cited no statutory provision requiring such approval for the classifications to become effective. A *temporary* statutory provision indicated that any challenge to the allocation of positions would be reviewed by the director within 60 days. *See* 1980 Minn. Laws ch. 617, § 40, at 1604. But there is no evidence that any successful challenge was made to that allocation during the time period allowed for review.

Legislative history further shows that, when the previous Unit 11 was split into two units in 1991, the university submitted

[7]. It is undisputed that the classifications of senior lecturer and senior teaching specialist did not yet exist in 1981. SEIU has not argued that these variations on the positions of lec-

turer and teaching specialist "have not been assigned," for the purpose of allowing their current assignment under Minnesota Statutes section 179A.10, subdivision 4.

to the legislature another list of classifications to be included in the proposed Unit 11, the academic and professional unit. These classifications included the disputed classifications of lecturer and teaching specialist. SEIU argues that there is no evidence that the legislature adopted the university's proposed list in 1991.[8] But no statutory provision exists requiring the legislature to expressly adopt that list. And its existence during legislative debate over the decision to create Unit 11 supports the determination that the classifications were assigned to it.

■ In summary, after examination of the relevant statutory provisions, as well as their legislative history, we conclude that the teaching specialists, lecturers, senior teaching specialists, and senior lecturers do not fall within the classifications specified by statute for inclusion in bargaining Unit 8, but rather are classifications that have been previously assigned to bargaining Unit 11. *See* Minn. Stat. § 179A.10, subd. 4.[9]

## II. The BMS finding that the disputed classifications of teaching specialist and lecturer have been significantly modified in occupational content is unsupported by substantial evidence.

BMS found that, even if the disputed classifications were previously assigned

under section 179A.11, they have been significantly modified in occupational content, so that BMS had authority to assign them to Unit 8. *See id.*

At the outset, the university maintains that due-process requirements were violated because it lacked notice that BMS would address this issue in its order. We disagree. Although the parties agreed that the modification issue was not yet under consideration for purposes of the pre-hearing order, evidence on the issue was presented by SEIU at the hearing, and the university presented evidence in response. The university also responded to SEIU's arguments in its closing brief, asserting that there had not been a significant alteration in the occupational duties of the disputed classifications since 1991. Therefore, BMS properly addressed this issue in its final order.

We conclude, however, that BMS's finding that the occupational content of the disputed classifications had been significantly modified is unsupported by substantial evidence. In support of its finding on this issue, BMS contrasted two board-of-regents' policy statements referring to the duties of positions assigned to the academic staff professional and administrative unit. The first statement, issued in 1980, states that "[t]hese individuals are not en-

---

**8.** SEIU points out that the 1991 proposed list also included the positions of research associate and research fellow, which ultimately remained in Unit 8. *See* 1991 Minn. Laws ch. 77; Minn. Stat. § 179A.11, subd. 1(8). But the university asserts, and SEIU does not dispute, that confusion existed over the research-associate and research-fellow positions because they are now-inactive faculty positions in the tenure code, which were always assigned to Unit 8, but they have more recently been used to describe academic professional positions that are not faculty positions. And any confusion about the classification of these positions, which are not at issue here, does not

affect the inclusion of lecturer and teaching specialist in the 1991 list for Unit 11.

**9.** We note that this conclusion is consistent with previous administrative authority. *See, e.g., Int'l Bhd. of Elec. Workers, Local 292,* BMS Case No. 87-PR-8 (June 29, 1987) (determining that BMS lacked authority to reassign the employment classification of radio and TV broadcast technician to a different bargaining unit at the university because that classification had been assigned in 1980, and its occupational content had not significantly changed).

gaged in full-time teaching and scholarly work, as are faculty, but rather are assigned to duties enhancing the research, teaching, and service functions of the University." The second statement, issued in 2005, does not expressly contrast members of these classifications with faculty, but states that "[t]hese individuals may be engaged in teaching, research, service, and a wide variety of other professional functions within the University." BMS found that the change reflected in the 2005 policy statement, which refers to "teaching, research, [and] service," and omits the former language of duties "enhancing" those functions, shows that the disputed classifications have been significantly modified and now parallel faculty in their occupational contents.

We reject this argument. The statute requires that for BMS to assign a classification to a bargaining unit, the occupational content of that position must have been "significantly modified." Minn. Stat. § 179A.10, subd. 4. "Significant" has been described as "meaningful," "[h]aving or likely to have a major effect," or "[f]airly large in amount or quantity." *The American Heritage Dictionary of the English Language* 1679 (3d ed. 1992). Both the 1980 and the 2005 regents' policies state that academic professionals may be involved in research, teaching, and service. Although the 2005 policy no longer refers to them as playing a supporting role, it does not specify different duties required or different skill sets for performing those duties. And it does not impose the requirements of research and service that are contained in the faculty tenure code. Thus, although the 2005 policy statement envisions that academic professionals may in some situations engage in research and service, it does not mandate an expanded role for those classifications so as to amount to a "significant[ ] modifi[cation] in occupational content," allowing assignment of the disputed classifications to a different bargaining unit. Minn. Stat. § 179A.10, subd. 4. Therefore, based on the difference between these two policies alone, the BMS determination that the classifications have been "significantly modified" is not supported by substantial evidence that a reasonable mind may accept as adequately supporting that determination. *Patzwald*, 306 N.W.2d at 120.

SEIU argues that, in addition to the difference in the two policy statements, testimony at the hearing shows that the use of academic professionals has significantly grown at the university. For instance, SEIU points to testimony of Professor Richard McCormick in the Department of German, Scandinavian, and Dutch in the College of Liberal Arts, who stated that, in that department, the numbers of academic professionals have grown, and they are being used more extensively. But to show a substantial modification in occupational content, SEIU was required to demonstrate not just a growth in numbers, but a significant change in the occupational duties performed by these employees. And although Professor McCormick testified that academic professionals who are not faculty are teaching some advanced courses and participating in faculty meetings, he indicated that the main difference had been in their use and hiring on indefinitely-renewable contracts, rather than in their assigned duties. Further, at least four other professors from different departments testified that, in their experience, which extended back a number of years, the occupational content of teaching specialists and lecturers had not changed. They did point to significant growth in their use by the university. But increased use of these professionals as a budget tool to alleviate funding issues at the university does not

change the nature of their job duties, and a significant change in occupational content is what the statute requires before BMS may reassign the classifications under PELRA.[10]

Neither the policy statements advanced nor the overall hearing testimony demonstrates a significant change in the occupational content of the lecturers and teaching specialists. Therefore, on this record, we conclude that BMS's determination of significant modification of occupational content is unsupported by substantial evidence. In view of this conclusion, we do not reach the additional portion of BMS's ruling determining that a majority of employees in the disputed classifications share a community of interest with the employees assigned to Unit 8. *See* Minn. Stat. § 179A.10, subd. 4.

We are mindful of important policy arguments advanced by the parties and amici curiae on both sides of this issue. For instance, we recognize the significant role of faculty in our state's premiere research university: faculty who must follow tenure-code requirements of research and service, as well as teaching, and who play an important role in university governance. We also note the substantial interests of the employees at issue here, who share with faculty expectations of academic freedom, as well as appropriate workload, compensation, and benefits, which may be addressed through collective bargaining. Implications for students and budgets also surround the university's expanded use of a more contingent workforce. But while these considerations may be at the heart of a public policy dispute, the only issue before us is whether BMS had the authority under the law to assign these lecturers and teaching specialists. Upon this record, in this unit-determination case, we conclude that it did not.

## DECISION

BMS lacked statutory authority to assign the disputed classifications of lecturer, senior lecturer, teaching specialist, and senior teaching specialist to Unit 8 because the plain language of Minnesota Statutes section 179A.11, subdivision 1(8), refers to specified faculty ranks, and employees in the disputed classifications do not hold faculty rank. In addition, because those classifications have been previously assigned to Unit 11 and their occupational content have not been significantly modified since that assignment, BMS may not assign them to a bargaining unit pursuant to Minnesota Statutes section 179A.10, subdivision 4. We therefore reverse the order relating to assignment of the disputed classifications.

**Reversed.**

---

10. SEIU further argues that limiting Unit 8 to positions defined by rank is inconsistent with BMS's over-arching statutory duty to assign classifications under PELRA. *See* Minn. Stat. § 179A.10, subd. 4. But that subdivision only authorizes BMS to assign classifications to a bargaining unit if they have either (1) not been previously assigned, or (2) been "significantly modified in occupational content" since their assignment. *Id.* Because neither of these conditions is met in this case, BMS lacked statutory authority to assign the disputed classifications to Unit 8.