# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A25-0569

Minnesota Nurses Association,
Respondent,

vs.

McLeod County,
Relator,

Public Employment Relations Board,
Respondent.

**Filed February 9, 2026**
**Affirmed**
**Bratvold, Judge**

Public Employment Relations Board
File No. 24-U-036

Timothy J. Louris, Emily L. Marshall, Jacob C. Harksen, Louris Marshall O'Brien, P.A., Minneapolis, Minnesota (for respondent Minnesota Nurses Association)

Ann R. Goering, Timothy A. Sullivan, Ratwik, Roszak & Maloney, P.A., St. Paul, Minnesota (for relator McLeod County)

Keith Ellison, Attorney General, Jennifer C. Moreau, Assistant Attorney General, St. Paul, Minnesota (for respondent Public Employment Relations Board)

Considered and decided by Schmidt, Presiding Judge; Bratvold, Judge; and Bentley, Judge.

## SYLLABUS

1.    A public employer's unilateral change of a term and condition of employment occurring during the unexpired term of a collective bargaining agreement may

be an unfair labor practice under section 179A.13, subdivisions 1 and 2(1), (5), of the Public Employment Labor Relations Act (PELRA), Minn. Stat. §§ 179A.01-.25 (2024).

2.      Counties, along with their agents and representatives, are prohibited from engaging in unfair labor practices as provided in Minnesota Statutes section 179A.13, subdivisions 1 and 2.

**OPINION**

**BRATVOLD**, Judge

In this certiorari appeal, relator McLeod County (the county) challenges a decision by respondent Public Employment Relations Board (PERB) that the county committed unfair labor practices in violation of the Public Employment Labor Relations Act (PELRA). PERB determined that the county unilaterally implemented and later unilaterally rescinded a wage increase for employees represented by respondent Minnesota Nurses Association (the union). PERB also determined that the county refused to negotiate with the union about either the wage increase or its rescission.

On appeal, the county argues that reversal is warranted because PERB's decision was based on legal errors and PERB imposed remedies that were not authorized by PELRA and arbitrary. Alternatively, the county contends that reversal is required because PERB engaged in ex parte communications with the union.

We conclude that the county fails to show that PERB's decision rested on an error of law or that the remedies were unauthorized by statute or otherwise arbitrary. PERB's determination that the county engaged in unfair labor practices finds ample support in its factual findings and the applicable law, as do the remedies for the violations. The ex parte

communications between PERB and the union do not warrant reversal of PERB's decision. Thus, we affirm.

## FACTS

These facts summarize the record and PERB's findings and are not disputed by the county.[1]

The union is the exclusive representative of public-health nurses, health educators, registered nurses, and public-health social workers whom the county employs, and the union is certified under PELRA to "meet and negotiate with the employer on behalf of all employees in the appropriate unit." Minn. Stat. § 179A.03, subd. 8. The county is a public employer under PELRA. *Id.*, subd. 15(a)(6). The union and the county entered into a collective bargaining agreement (CBA), effective January 1, 2023, through December 31, 2025. The CBA provides for a 3.0% general wage increase effective the first pay period in January of each year. The CBA also provides that either party may give "[w]ritten notice of desire to change or modify" the agreement and that the agreement reopens annually regarding health-insurance contributions.

On January 3, 2024, the county administrator wrote to all union employees, informing them that "[a]n additional [wage] increase beyond 3% is being awarded to

---

[1] Although the headings in the county's brief to this court refer to factual errors in PERB's decision and the county's brief refers to the substantial-evidence standard of review for factual findings, the county does not argue that PERB's factual findings were unsupported by substantial evidence. Indeed, when we compare the county's statement of facts to PERB's factual findings, we conclude that the material facts are undisputed. We understand the county to make arguments that hinge on legal error and not substantial-evidence review.

McLeod County employees in 2024." The January 3 letter also explained that the additional wage increase was based on a matrix created by the county in 2023. PERB found that the matrix "provided additional wage increases of between [0.5% and 3%] depending upon how the employee's 2023 wage compared to the mid-point of the pay scale." PERB also found that the union had "no input" in preparing the matrix.

The next day, the county emailed the union with a copy of its January 3 letter. PERB found that this was "the first time" the county informed the union that "it had decided to provide an additional wage increase."

The union responded on January 9, stating that it "demands to negotiate over this unilateral change to the terms and conditions of employment." The union also requested information relevant to the county's decision. The county implemented the wage increase on January 10.

On January 17, the county replied to the union, stating that it was surprised by the union's response, would reverse the wage increase, and saw "no need" to meet to negotiate:

> During the term of the previous contract the County Board . . . implemented a mid-contract wage increase without objection from the Union. The County did not anticipate an objection from the Union in light of our past experience.
>
> The County will immediately stop the increase, effective with the current pay period, thereby reversing the change to the terms and conditions of employment. Therefore, there is no need to meet to negotiate over any unilateral change . . . .
>
> The County is willing to enter into [a memorandum of agreement (MOA)] with the [union] on the same terms as it has with the other bargaining units. A copy of the MOA is

4

enclosed. As the CBA does not contain a wage reopener, the County will not meet to negotiate wages for 2024.

That same day, the union responded to the county that it "did not state it objected to the wage increases," adding that the union "has the right to meet and negotiate as well as request information necessary to understand the employer's proposals in relation to terms and conditions of employment." The union warned that "[a]ny roll back or canceling of the wage increases implemented will result in an immediate unfair labor practice charge."

On January 24, the county informed the union that rescission of the wage increase "was intended as a resolution necessary in response to your concern" and that the "reason the wage increases . . . had to be pulled back and amended is due to your threat" of an unfair labor practice charge. The county also stated that its offer of an MOA "stands" through February 5 and that "[w]e are not agreeing to meet and negotiate . . . . We are not authorized to meet and reopen wage negotiations for the current contract."

The union filed an unfair labor practice charge with PERB, alleging violations of Minn. Stat. § 179A.13, subd. 2(5), which prohibits public employers from "refusing to meet and negotiate in good faith with the exclusive representative of its employees in an appropriate unit."

On February 21, the county "formally rescinded" the wage increase.

The union amended its unfair labor practice charge, adding a violation of Minn. Stat. § 179A.13, subd. 2(1), which prohibits public employers from "interfering, restraining, or coercing employees in the exercise of the rights guaranteed" by PELRA. After considering

5

the charge, the amended charge, and the county's response along with other materials the parties submitted, PERB served a complaint and notice of hearing.

Following an evidentiary hearing, the hearing officer submitted a recommended order that included the parties' stipulations and proposed findings of fact along with legal analysis and proposed conclusions of law. The hearing officer determined that the county violated PELRA by committing unfair labor practices in four respects: (1) the county "implemented a unilateral wage increase paid to" union employees, (2) the county refused to meet and negotiate with the union over the unilateral wage increase, (3) the county refused to meet and negotiate with the union over the rescission of the unilateral wage increase, and finally, (4) the county unilaterally rescinded the wage increase. The hearing officer recommended remedies.

The county submitted exceptions to the recommended order, and the union responded. PERB considered the record, the hearing officer's recommended order, and the parties' written submissions.

PERB filed its written decision and order and found that the hearing officer's order "fully explains his factual findings and conclusions of law and details his reasons for rejecting" the county's arguments. PERB adopted the hearing officer's recommended order, including its findings of fact, conclusions of law, and recommended remedies. PERB discussed the county's exceptions, first rejecting its claim that the charges were unfounded because the county board took no action on the wage increase or rescission. PERB reasoned that PELRA "explicitly makes employers liable for the actions of its agents, such as the . . . county administrator." Second, PERB determined that the county committed two unilateral

changes in the terms of employment without bargaining with the union—the unilateral wage increase in January 2024 and the unilateral rescission of that wage increase in February 2024. Finally, PERB concluded that the county had a legal duty to bargain over both the wage increase and the rescission of the wage increase "regardless of their occurrence during the term of the" CBA. PERB ordered the county to take remedial action, including reinstating the January 10 wage increase, paying union employees wages lost as a result of the rescission of the wage increase, and ceasing and desisting from its refusal to bargain over the terms and conditions of employment.

The county petitioned for certiorari review of PERB's decision and order.

## ISSUES

I.  Did PERB's determination that the county committed unfair labor practices in violation of PELRA reflect an error of law?

II.  Were the remedial actions ordered by PERB without authority under PELRA or otherwise arbitrary?

III.  Did PERB engage in improper ex parte communications with the union before it released its decision, and if so, is reversal required?

## ANALYSIS

PELRA "governs labor relations between public employees and their employers." *Allen v. Hennepin County*, 680 N.W.2d 560, 563 (Minn. App. 2004), *rev. denied* (Minn. Aug. 17, 2004). PELRA's express public policy is "to promote orderly and constructive relationships between all public employers and their employees," which is "subject to the paramount right" of Minnesota citizens "to keep inviolate the guarantees for their health, education, safety, and welfare." Minn. Stat. § 179A.01(a). PELRA recognizes that

7

"[u]nresolved disputes between the public employer and its employees are injurious to the public as well as to the parties" and that the legislature "has determined that overall policy is best accomplished by," among other things, "requiring public employers to meet and negotiate with public employees in an appropriate bargaining unit" and "establishing special rights, responsibilities, procedures, and limitations regarding the public employment relationships." Minn. Stat. § 179A.01(c)(2)-(3).

PELRA prohibits unfair labor practices and authorizes any employer, employee, or employee organization "aggrieved by an unfair labor practice" to file a charge with PERB. Minn. Stat. § 179A.13, subd. 1(a). Section 179A.13, subdivision 2, outlines 14 unfair labor practices by employers. When an unfair labor practice charge is submitted to PERB, an investigation follows, and unless "the charge has no reasonable basis in law or fact," PERB "shall promptly issue" and serve a complaint as well as provide for a hearing before a hearing officer. *Id.*, subd. 1(b). The hearing officer issues a recommended decision and order. *Id.*, subd. 1(d). Parties may file exceptions to the hearing officer's recommended decision and order. *Id.*, subd. 1(k). PERB then reviews the recommended decision and order along with the exceptions and "may adopt all, part, or none of the recommended decision and order." *Id.* Certiorari review by this court is available. Minn. Stat. § 179A.052.[2]

---

[2] Before the legislature amended PELRA to create PERB, district courts had jurisdiction over unfair labor practice charges. *See* Minn. Stat. § 179A.13, subd. 1 (2012); 2014 Minn. Laws ch. 211, §§ 5, 7, at 501-02 (creating PERB and establishing review of PERB decisions by the court of appeals).

"[D]ecisions of administrative agencies enjoy a presumption of correctness, and deference should be shown by courts to the agencies' expertise and their special knowledge in the field of their technical training, education, and experience." *Anoka County v. Law Enf't Lab. Servs., Inc.*, 3 N.W.3d 586, 591 (Minn. 2024) (quotation omitted). "Review by certiorari is limited to an inspection of the record" and "is necessarily confined to questions affecting the jurisdiction of the board . . . and, as to [the] merits of the controversy, whether the order or determination . . . was arbitrary, oppressive, unreasonable, fraudulent, under an erroneous theory of law, or without any evidence to support it." *Dietz v. Dodge County*, 487 N.W.2d 237, 239 (Minn. 1992) (quotation omitted).

"Although we generally defer to an agency's expertise and knowledge in terms of the agency's technical training and experience, appellate courts are not bound by an agency's interpretation of PELRA." *Serv. Emps. Int'l Union, Local 284, S. St. Paul, Minn. v. Univ. of Minn. Unit 8, Minneapolis, Minn.*, 902 N.W.2d 54, 57 (Minn. App. 2017) (citation omitted). Similarly, "[i]nterpretation of case law is a legal question that [appellate courts] review de novo," *Law Enf't Lab. Servs., Inc.*, 3 N.W.3d at 593-94, and "[t]his court reviews questions of statutory construction de novo." *Indep. Sch. Dist. No. 281 v. Minn. Dep't of Educ.*, 743 N.W.2d 315, 324 (Minn. App. 2008).

## I.     PERB's determination that the county committed unfair labor practices does not reflect an error of law.

On appeal, the county contends that PERB legally erred in determining that the county committed unfair labor practices. PERB determined that the county twice committed unfair labor practices when it "interfered with employees in the exercise of

rights guaranteed" by PELRA—first, by implementing "a unilateral wage increase" and, second, by later unilaterally rescinding that wage increase. PERB concluded that the unilateral changes to wages "circumvented the employees' right to bargain." PERB also determined that the county twice committed unfair labor practices "by refusing to meet and negotiate" with the union "in good faith" over the unilateral wage increase and the "rescission of the unilateral wage increase."

We conclude that PERB did not legally err in determining that the county committed unfair labor practices by unilaterally implementing and later rescinding the January 10 wage increase and by refusing to bargain about the increase and rescission.

We begin by considering the rights and obligations of public employers and employees under PELRA, then examine caselaw applying those provisions to unilateral actions by a public employer. We next apply the relevant statutes and caselaw to PERB's factual findings. Finally, we consider the county's arguments for reversal of PERB's unfair labor practice determinations.

PELRA grants public employees the right to meet and negotiate with their employer regarding the terms and conditions of employment. Minn. Stat. § 179A.06, subd. 5. Public employers have a corresponding obligation to meet and negotiate with public employees regarding the terms and conditions of employment. Minn. Stat. § 179A.07, subd. 2(a). The terms and conditions of employment include compensation and benefits. Minn. Stat. § 179A.03, subd. 19. It is an unfair labor practice for "[p]ublic employers, their agents and representatives" to interfere with employees' rights guaranteed under PELRA or to refuse "to meet and negotiate in good faith." Minn. Stat. § 179A.13, subd. 2(1), (5).

10

Caselaw on unilateral changes by public employers guides our analysis. In *Foley Education Association v. Independent School District No. 51*, the Minnesota Supreme Court affirmed the conclusion that a school district had committed an unfair labor practice when it unilaterally assigned persons who were not licensed as teachers to supervise study hall and those duties traditionally had been assigned to teachers. 353 N.W.2d 917, 924 (Minn. 1984). The supreme court reasoned, first, that "unilateral changes by an employer in terms and conditions of employment are prima facie violations of its employees' collective bargaining rights." *Id.* at 920-21 (citing *NLRB v. Katz*, 369 U.S. 736 (1962)). This is because, "even in the absence of subjective bad faith, an employer's unilateral change of a term and condition of employment circumvents the statutory obligation to bargain collectively with the chosen representative of his employees in much the same manner as a flat refusal to bargain." *Id.* at 921.

The supreme court added, however, that such a unilateral change "is not *per se* an unfair labor practice." *Id.* Courts may determine that a public employer's unilateral change was not a violation in specific circumstances, one of which is if "there was not a bad faith refusal to bargain." *Id.*[3] In analyzing whether there was "not a bad-faith refusal to bargain," courts consider whether the union was "in fact given an opportunity to bargain on the

---

[3] The supreme court in *Foley* identified two other circumstances in which a unilateral change by the employer is not an unfair labor practice—if "the subject" of the change "is not a 'mandatory' bargaining term" or if the "'change' is consistent with the past practices of the parties." *Id.* The county does not dispute that wages are a mandatory bargaining term. We reject the county's claim that the unilateral wage increase was consistent with "past practices of the parties" in our analysis of the county's arguments about a legal principle known as contract-modification theory, which we define and discuss below. *See infra* Part I.D.

subject," whether the CBA "authorized the change," or whether "the union waived its right to bargain." *Foley*, 353 N.W.2d at 921.

Under *Foley*, the county's unilateral implementation and rescission of the January 10 wage increase violated the employees' collective bargaining rights. The county unilaterally implemented and rescinded the January 10 wage increase—a term and condition of employment subject to mandatory bargaining. *See* Minn. Stat. § 179A.03, subd. 19 (defining terms and conditions of employment to include wages). The county also rejected the union's request to negotiate over the January 10 wage increase and continued to refuse to negotiate while rescinding the wage increase. *See* Minn. Stat. § 179A.06, subd. 5 (granting employees the right to meet and negotiate over terms and conditions of employment).

None of the circumstances excusing a unilateral change exist. The county did not allow the union to bargain, the CBA did not authorize the implementation or rescission of the wage increase, and the union did not waive its right to bargain. Indeed, the county made a "flat refusal to bargain" while unilaterally implementing and later rescinding a wage increase, and thus the county circumvented the union's right to bargain. *See Foley*, 353 N.W.2d at 921. PERB therefore did not err in determining that the county committed unfair labor practices under PELRA.

The county nevertheless urges us to reverse PERB's determination for four reasons, which we consider in turn.

### A.   PELRA prohibits unfair labor practices by the county and its agents and representatives.

The county argues that the January 10 wage increase was not an unfair labor practice because "the County Board did not act on the 2024 off-cycle wage increase, and the County Administrator and other County employees lacked statutory authority to bind the County on this matter." PERB responds that it is not material whether the county board acted on the January 10 wage increase because "the issue is whether the Employer, 'their agents and representatives' committed an unfair labor practice under [PELRA] section 179A.13, subd. 2."[4]

The county makes this argument specifically with respect to the January 10 unilateral wage increase. In doing so, the county cites Minn. Stat. §§ 373.01-.02 (2024) to argue that it did not violate PELRA because the power to contract with employees "rests solely with the elected County board." We understand the county to urge that the county administrator's January 3 letter and subsequent rescission of the wage increase were not authorized by the county board.[5]

To support its position that the county committed an unfair labor practice, PERB points to PELRA's provision prohibiting "[p]ublic employers, their agents and representatives" from committing unfair labor practices. Minn. Stat. § 179A.13, subd. 2.

---

[4] The union offers arguments similar to those in PERB's brief. As a result, we consider the union's contentions through our analysis of PERB's arguments.

[5] Because we conclude that unilateral implementation and rescission of a wage increase by the county's agents and representatives violates PELRA's prohibition on unfair labor practices, we need not discuss the county's argument that PERB erred in finding that "the county" acted on the wage changes absent formal approval by the county *board*.

13

The county does not interpret this provision of PELRA, however, and instead relies on a statute in an entirely different chapter. Section 373.01 sets out a county's powers, including the authority to make contracts; the county also urges us to consider section 373.02, which provides that the county's powers "shall only be exercised by the county board." In short, the county contends that PELRA's provisions on unfair labor practices "must be interpreted consistently with those laws governing the powers of municipalities and their agents."

The parties' dispute on this issue asks us to interpret section 179A.13, subdivision 2. "The goal of statutory interpretation is to effectuate the intent of the legislature." *In re Murack*, 957 N.W.2d 124, 128 (Minn. App. 2021). "The plain language of the statute is our best guide to the Legislature's intent." *Energy Pol'y Advocs. v. Ellison*, 980 N.W.2d 146, 158 (Minn. 2022). No party contends that the relevant PELRA provision is ambiguous, and we determine that it is unambiguous. We therefore conclude the legislature has expressly provided that public employers, along with "their agents and representatives," are prohibited from committing unfair labor practices. Minn. Stat. § 179A.13, subd. 2. The relevant language in section 179.13, subdivision 2, provides no exceptions or additional requirements.

We reject the county's suggestion that we incorporate sections 373.01 and 373.02 for two reasons. First, the county's interpretation of PELRA would essentially insert an additional requirement for unfair labor practice claims against the county—providing that "public employers, their agents and representatives are prohibited" from committing unfair labor practices *through an act of the county board*. Courts do not add language to a statute.

14

*See Energy Pol'y Advocs.*, 980 N.W.2d at 156, 158 (rejecting an interpretation of unambiguous statutory language because it added language to the statute).

Second, the county's interpretation of PELRA would render insignificant or meaningless its provisions as to agents and representatives, leaving the county's agents and representatives free to commit unfair labor practices so long as they did so without an act of the county board. *See Harkins v. Grant Park Ass'n*, 972 N.W.2d 381, 387 (Minn. 2022) (rejecting an interpretation of a statute "contrary to the principle" that courts "attempt to avoid interpretations that would render a word or phrase superfluous, void, or insignificant"); *McBee v. Team Indus., Inc.*, 925 N.W.2d 222, 229 (Minn. 2019) (rejecting an interpretation of statute, in part, because it "would make the word 'unless' meaningless, an outcome normally disfavored in statutory interpretation"); *see also* Minn. Stat. § 645.16 (2024) ("Every law shall be construed, if possible, to give effect to all its provisions.").

In short, the county seeks to excuse its unilateral implementation and rescission of a wage increase because those acts did not result from a formal resolution of the county board. We are not persuaded because the county's interpretation asks us to insert a requirement for "county board" action and also renders superfluous PELRA's prohibition against unfair labor practices by the "agents and representatives" of counties.[6] We therefore

---

[6] We also reject the county's related argument that the county administrator's "purported action to modify a contract is ineffective" absent actual or apparent authority to implement or rescind the unilateral wage increase and to refuse to bargain. The county administrator's actual or apparent authority is not an issue because the county implemented and rescinded the wage increase and refused the union's request to bargain throughout the relevant period.

15

hold that counties, along with their agents and representatives, are prohibited from engaging in unfair labor practices, as provided in section 179A.13, subdivisions 1 and 2.

**B.    The county's refusal to meet and negotiate about implementing and rescinding the January 10 wage increase is not excused because it occurred during the CBA's unexpired term.**

The county maintains that its implementation and rescission of the January 10 wage increase and its related refusal to bargain were not unfair labor practices for two reasons. First, the county argues that PELRA does not require an employer to "reopen a closed contract to bargain over terms expressly covered by the [contract] during its unexpired term." Second, the county contends that PERB erred in "imposing affirmative bargaining obligations upon the County" because "there is no continuous obligation—or right—to bargain over matters covered by a contract midterm." PERB counters that "PELRA mandates bargaining over wages without any consideration of whether a CBA is in effect, closed, or subject to reopening."

We are not persuaded by the county's first argument. PELRA provides for a public employer's obligation to bargain about the terms and conditions of employment and does not mention whether the parties are operating under an existing agreement, much less excuse the obligation to bargain on that basis. Minn. Stat. § 179A.07, subd. 2. In other words, the statute does not include language that supports the county's argument. The Minnesota Supreme Court offers some support for rejecting the county's position. In interpreting PELRA, the supreme court recognized that the employer and employee's duty to meet and negotiate under the National Labor Relations Act (NLRA), 29 U.S.C. §§ 151-169 (2018), "extends beyond the negotiation stages and applies to grievances and

16

labor management relations during the term of the agreement." *Int'l Union of Operating Eng'rs, Local No. 49 v. City of Minneapolis*, 233 N.W.2d 748, 752-53 (Minn. 1975) (citing *NLRB v. C & C Plywood Corp.*, 385 U.S. 421 (1967)). The supreme court has stated that, when interpreting PELRA, "it is often instructive to refer to decisions interpreting" the NLRA, though such decisions are not binding. *Id.* at 752.

Caselaw from this court also reinforces our conclusion that unfair labor practices may arise during the unexpired term of a CBA. In *Education Minnesota-Greenway, Local 1330 v. Independent School District No. 316*, this court upheld an unfair labor practice determination when a school district "unilaterally froze wages and benefits *under the existing CBA*" with a teacher's union. 673 N.W.2d 843, 849 (Minn. App. 2004) (emphasis added), *rev. denied* (Minn. Apr. 20, 2004). At the time the school district froze wages and benefits for its teachers, the original term of the CBA had expired. *Id.* at 846. But this court noted, by "law and by its terms, that CBA remained in effect until the parties reached a new agreement." *Id.*

The county contends that *Education Minnesota-Greenway* is "starkly different from the present case" because the employer's unilateral change occurred "after the labor agreement had expired, during successor agreement negotiations." The county is correct that, unlike the CBA in *Education Minnesota-Greenway*, the CBA here had not yet expired. But we see no reason to distinguish between a public employer's unilateral change to wages—a term and condition of employment—during a CBA's unexpired term and a similar unilateral change while a CBA remains in effect after expiration, as in *Education Minnesota-Greenway*.

17

This court's reasoning in *Education Minnesota-Greenway* suggests that no distinction should be made. There, this court bluntly stated that, because of the school district's unilateral change, "[t]he union was placed in the position of having to bargain for wages and benefits that were already in place" and thus the school district violated its statutory duty to meet and negotiate with the union. *Id.* at 852. The same is true here because the county's unilateral change placed the union in the position of bargaining for a wage increase that was not in the CBA. Thus, the county unilaterally altered the union's bargaining position for a successor CBA.

Second, the county asks us to apply the covered-by doctrine, which provides that a union may "exercise its right to bargain about a particular subject by negotiating for a provision in a collective bargaining contract that fixes the parties' rights and forecloses further mandatory bargaining as to that subject." *NLRB v. U.S. Postal Serv.*, 8 F.3d 832, 836 (D.C. Cir. 1993). The county contends that, because "wage increases were negotiated and memorialized for the full term [of the CBA], the covered-by doctrine protects both the County and the Union from any obligation to continue bargaining over wages within this timeframe." The county relies on NLRA caselaw to support its position. We conclude that the caselaw cited by the county is not helpful or persuasive.

The county first cites *United States Postal Service*, in which a federal appellate court affirmed a district court's decision that an employer did not commit an unfair labor practice by refusing to bargain over service reductions. *Id.* at 834. There, the CBA gave the employer "the authority unilaterally to implement the disputed service reductions." *Id.* This decision is not persuasive here because the CBA governing these parties provides for a

"3.0% general wage increase effective the first pay period in January" and does not provide for unilateral implementation or rescission of midterm wage changes. It is undisputed that the January 10 wage increase was separate from the annual general wage increase under the CBA.

The county also cites *Connecticut Light & Power Co.*, in which the National Labor Relations Board (NLRB) held that an employer incurs no "bargaining obligation on *proposing* a midterm contract modification when the contract does not contain any reopener language." 271 N.L.R.B. 766 (1984) (emphasis added). This decision is not persuasive here because the county did *not* merely propose the wage increase and rescission. The county unilaterally implemented the January 10 increase and paid wages at the increased rate, then unilaterally rescinded the wage increase—unilaterally changing the terms and conditions of employment. We conclude that NLRA caselaw does not establish that the covered-by doctrine applies to the CBA governing these parties under these circumstances.

In sum, a public employer's duty to meet and negotiate about the terms and conditions of employment under PELRA continues during the term of an unexpired CBA. And the covered-by doctrine does not excuse the county from its bargaining obligations under PELRA because the CBA does not authorize the county to unilaterally implement or rescind a midterm wage increase.

**C.** **The county's unilateral implementation and rescission of the January 10 wage increase is not excused as a contract modification.**

The county urges this court to excuse the county's conduct based on a "contract modification" theory, as explained in NLRB decisions interpreting the NLRA. The county contends that "PERB erred by failing to recognize this case as a 'contract modification' matter," leading PERB to (1) "ignore[] the fact that [the county] had a 'sound arguable basis' for believing the 2024 off-cycle increase was appropriate" and (2) impose "inappropriate remedies." In essence, the county argues that PERB mistakenly identified the county's unilateral wage increase as a unilateral change to the CBA and mischaracterized the rescission of the wage increase as an unfair labor practice rather than an appropriate cure of the unilateral increase.

Section 8(d) of the NLRA defines the obligation to bargain collectively under section 8,[7] with a proviso that "where there is in effect a collective-bargaining contract . . . the duty to bargain collectively shall also mean that no party to such contract shall terminate *or modify* such contract" unless the party provides timely notice to other parties to the contract and to mediators and "offers to meet and confer with the other party." 29 U.S.C. § 158(d) (emphasis added); *see Bath Iron Works Corp.*, 345 N.L.R.B. 499, 501 (2005) (discussing NLRA's prohibition on terminating or modifying a contract as the

---

[7] Section 8(a) of the NLRA provides that it "shall be an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" under section 7 of the NLRA or "to refuse to bargain collectively with the representative of [its] employees." 29 U.S.C. § 158(a)(1), (5).

"relevant part" of section 8(d) for contract-modification theory), *enforced sub nom. Bath Marine Draftsmen's Ass'n v. NLRB*, 475 F.3d 14 (1st Cir. 2007).

PERB urges us to reject the contract-modification theory, contending that "there is no provision in PELRA analogous to the modification provisions in section 8(d)" of the NLRA and that "cases distinguishing between 'contract modification' and 'unilateral change' are therefore unhelpful and do not overcome the application of PELRA." The union argues that, even if the distinction between unilateral-change and contract-modification theories applies under PELRA, "the Union and PERB clearly framed the allegations and litigated the claims in this case under 'unilateral change' principles, as applied by Minnesota courts."[8]

We agree with PERB that PELRA does not have a provision analogous to section 8(d)'s prohibition on contract termination or modification. The county contends that "PELRA contains clear analogous provisions" to NLRA section 8(d), but none of the provisions cited by the county describes modification of a contract as a violation of the duty to meet and negotiate.

---

[8] Alternatively, PERB and the union contend that the county failed to raise the contract-modification issue before the hearing officer and PERB and therefore forfeited it on appeal. The county responds that it adequately preserved this issue. Generally, a party may not "obtain review by raising the same general issue litigated below but under a different theory." *Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988); *see also Law Enf't Lab. Servs., Inc. v. Sherburne County*, 695 N.W.2d 630, 639 & n.7 (Minn. App. 2005) (applying *Thiele* in an appeal interpreting PELRA).

Here, we assume without deciding that the contract-modification issue is properly before us and is available under PELRA. *Cf. Foley*, 353 N.W. 2d at 921 (recognizing that a unilateral change is not a bad-faith refusal to bargain if "the collective bargaining agreement authorized the change" or the change is "consistent with the past practices of the parties").

21

Even if contract-modification theory were available under PELRA, we are not persuaded that the county's unilateral implementation and rescission of the January 10 wage increase were excused as contract modifications. Relying on NLRB caselaw, the county argues that, under the contract-modification theory, when an employer "change[s] a specific negotiated term of the contract without union consent," the remedy is "to enforce the contract as written," not an order to bargain. *See Bath Iron Works Corp*., 345 N.L.R.B. at 501. The county also contends that an employer's contract modification may be excused when it has a "sound arguable basis" for interpreting the CBA as it did. *See NLRB v. Solutia, Inc.*, 699 F.3d 50, 72 (1st Cir. 2012). An employer may show a "sound arguable basis" for modifying a contract based on the language of the labor contract or the parties' past practice. *Id.*

The county fails to show either ground for contract modification. First, the county does not identify any language in the CBA that authorizes a unilateral, off-cycle wage increase or rescission, and it insists that it "has never taken the position that the mid-term wage increase was lawful."

Second, we are not persuaded by the county's argument that "a similar off-cycle increase" in 2022 established a "sound arguable basis" for the 2024 wage increase. *Id.* Past practice is not established based on a single instance. *See Ramsey County v. AFSCME, Council 91, Local 8*, 309 N.W.2d 785, 788 n.3 (Minn. 1981) ("Past practice has been defined as a prior course of conduct which is *consistently made* in response to a *recurring situation* and regarded as a correct and required response under the circumstances.") (emphasis added) (quotation marks omitted).

22

Thus, even assuming that the contract-modification theory is available to the county, we conclude that PERB did not commit legal error by refusing to apply it here. Without support in either the CBA or the parties' past practice, the county cannot rely on contract modification to excuse its unfair labor practices in violation of PELRA. Therefore, the unilateral rescission of the January 10 wage increase was a separate violation of PELRA, not a remedy, and the appropriate remedy under PELRA is not limited to enforcing the terms of the CBA.

D.    **The county's unilateral rescission of a unilaterally imposed term and condition of employment is not the equivalent of ceasing an unfair labor practice.**

The county argues that "an employer may cure its own initial wrongdoing." The county also contends that a "unilateral change that is 'briefly implemented and then rescinded' does not constitute a continuing" unfair labor practice, urging that "[s]uch an interpretation places the county, and by extension, all public employers in an impossible situation, effectively depriving them of any meaningful ability to self-cure or even mitigate alleged violations." PERB disagrees and contends that "the correction" for the county's unilateral wage increase "would be to bargain, not to make another unilateral change that takes away a benefit."

At the outset, we agree with PERB that, by this argument, the county implicitly admits that the January 10 unilateral wage increase was an unfair labor practice. We also agree with PERB that the county's "cure" argument undermines its position that it is not responsible for an unfair labor practice without formal action by the county board. Setting aside these weaknesses in the county's "cure" argument, the county's sole authority is an

23

unreported decision of the NLRB, *Dycora Transitional Health-Fresno, LLC*. No. 32-CA-215700 (NLRB Feb. 28, 2019), https://apps.nlrb.gov/link/document.aspx/ 09031d4582b11624 [https://perma.cc/P5MS-QERB].[9]

The facts in *Dycora* are not analogous. In *Dycora*, the employer adjusted employees' shift schedules to start and end 15 minutes earlier without bargaining with the union. *Id.*, slip op. at 4. On the first day the new schedule was in effect, "a total of 8 employees arrived 15 minutes earlier." *Id.*, slip op. at 7. The employer "informed all . . . employees that same morning . . . that the new schedule was rescinded." *Id.* The ALJ found that the employer's briefly implemented unilateral change to employees' schedules was "de minimis, and not a material and substantial change," observing that, "at most, eight employees in a unit of about 190 employees were affected." *Id.*, slip op. at 9 (quotation omitted). Here, the county's unilateral implementation of the January 10 wage increase affected all union employees, unlike a schedule shift that did not change total hours or wages. *Dycora* therefore does not support the county's argument.

PERB also relies on an NLRB decision, *Faro Screen Process, Inc.*, to argue that rescission of the wage increase was a separate unfair labor practice. 362 N.L.R.B. 718 (2015). PERB contends that, like the employer in *Faro*, the county "purposefully imposed the [January 10 wage] increase—i.e., it was not an inadvertent mistake—[therefore] it

---

[9] *Dycora* is not precedential authority for the NLRB because the administrative-law judge (ALJ)'s recommendation became final after no exceptions were filed. *See Watsonville Newspapers, LLC*, 327 N.L.R.B. 957, 959 n.4 (1999) (stating that the NLRB accepts an ALJ's "findings to which no exceptions are filed" as a matter of course but that such findings "are not . . . considered precedent for any other case").

cannot be rescinded without providing notice and an opportunity to bargain." In *Faro*, the employer implemented a wage increase and "posted a letter [to employees] stating that 'Union negotiations are underway,' but announcing that the [employer] was implementing its proposed 2-percent wage increase." *Id.* at 718. The union objected to the unilateral wage increase, and the employer rescinded the wage increase and posted another letter: "The union has informed me that they object to implementing the 2 percent raise early. I will rescind early implementation." *Id.*

The NLRB concluded that the employer's unilateral wage increase was unlawful and that the "unilateral rescission of the wage increases also constitutes an unlawful unilateral change, for all the same reasons." *Id.* at 725. Determining that the employer's "initial change was not an inadvertent mistake," the NLRB reasoned that, "[h]aving unlawfully made the change, it cannot be rescinded without providing notice and an opportunity to bargain." *Id.*

The facts in *Faro* closely parallel the facts here. *Faro*'s reasoning therefore is persuasive and supports our conclusion that the county's unilateral rescission of the January 10 wage increase was an unfair labor practice and did not "cure" or cease the unlawful wage increase.[10]

_____

[10] The county argues that *Faro* is distinguishable because "the employer in *Faro* engaged in direct communications blaming the union for rescinding the increase; no such allegations, let alone findings, exist in this case." This argument is contrary to the record, which establishes that the county attributed the rescission to the union's response to the January 10 wage increase. On January 24, the county administrator emailed the union: "Given the history of your interactions with the county, the threat of an unfair labor practice being filed is treated as a likely event and responded to accordingly . . . . The reason the

In sum, the county and its agents and representatives are prohibited from engaging in unfair labor practices under PELRA. The county's unilateral changes to the terms and conditions of employment were not excused by the terms of the unexpired CBA, by the covered-by doctrine, as a contract modification, or as a "cure." Because the county unilaterally implemented and rescinded the January 10 wage increase and the county refused to negotiate about these changes, PERB did not legally err in determining that the county committed unfair labor practices in violation of Minn. Stat. § 179A.13, subds. 2(1), (5).

## II. PERB's remedy did not exceed PERB's statutory authority and was not arbitrary.

When a hearing officer determines that a charged party "has engaged in or is engaging in an unfair labor practice," the hearing officer's order must require "the party to cease and desist from the unfair labor practice" and order "any appropriate relief to effectuate the policies of this section, including but not limited to reinstatement, back pay, and any other remedies that make a charging party whole." Minn. Stat. § 179A.13, subd. 1(i).

To remedy the county's PELRA violations, PERB ordered the county to cease and desist from "refusing to bargain collectively" with the union "by unilaterally and without notice" to the union "changing the terms and conditions of employment," including "unilaterally granting" a wage increase and "rescinding previously employer-granted wage

---

wage increases above the standard had to be pulled back and amended is due to your threat."

26

increases." PERB also ordered the county to (1) pay union employees "the wage increase granted on January 10, 2024"; (2) pay union employees "any wages lost as a result" of the unilateral wage rescission "until such time as the [county] and union meet, bargain and complete negotiations regarding the wage increase"; (3) "pay affected employees a seven percent (7%) interest per annum on all retroactive pay"; and (4) post copies of PERB's decision and order "in conspicuous places."

On appeal, the county seeks to reverse the portions of PERB's order reinstating the January 10 wage increase, directing payment of back pay, and requiring the county to meet and negotiate on the wage increase. The county does not separately challenge the other terms of PERB's remedy. The county argues two reasons to overturn the challenged remedies, which we discuss in turn.

### A. PERB's Statutory Authority

Appellate courts review claims that an administrative agency has exceeded its statutory authority under the standard set out in *Dietz*. *See Minn. Internship Ctr. v. Minn. Dep't of Educ.*, 10 N.W.3d 178, 180, 182-83 (Minn. 2024) (applying *Dietz* to decide whether the Minnesota Department of Education exceeded its statutory authority in auditing a charter school in response to a fraud claim). Whether an agency has exceeded its statutory authority is a question of law that appellate courts review de novo. *Id.* at 183. The county presses three ways in which PERB exceeded its statutory authority in ordering reinstatement of the wage increase and back pay. The county's argument largely reprises its arguments to overturn PERB's unfair labor practice determinations.

First, the county argues that PERB lacked statutory authority to order "the County to meet and negotiate on terms and conditions of employment that are explicitly covered by a closed labor agreement with no reopener clause." In response, PERB contends that the unexpired CBA does not excuse the county from its obligation to meet and negotiate about the terms and conditions of employment, as provided by PELRA. As discussed above, we conclude that the covered-by doctrine does not excuse the county from its obligations under PELRA because the CBA does not authorize the county to unilaterally implement or rescind a wage increase.

Second, the county argues that the union was "made whole" when the county "cease[d] the complained-of conduct and restore[d] the employment terms and conditions set forth in the CBA" and that, therefore, "no further remedy is warranted or appropriate under PELRA, and any remedy beyond this scope exceeds PERB's statutory authority." PERB argues that the remedies ordered are authorized because it may order "other remedies that make a charging party whole." Minn. Stat. § 179A.13, subd. 1(i). PERB points out that the county's unilateral rescission of the January 10 wage increase "not only decreased the Union employees' current wages but also adversely affected their pay rate for future years" and that, therefore, reinstatement and back pay are warranted.

The county's "made whole" argument is not persuasive because it assumes that the rescission of the January 10 wage increase was not an unfair labor practice. Moreover, section 179A.13, subdivision 1(i), authorizes PERB to order "reinstatement, back pay, and any other remedies that make a charging party whole." That is exactly what PERB's

28

reinstatement and back-pay remedies accomplish, given the long-term effects of the county's unilateral rescission.

Third, the county contends that PERB "exceeded its authority by ordering the County to meet and negotiate on terms and conditions of employment that are explicitly covered by a closed labor agreement with no reopener clause." As discussed above, PELRA requires public employers to bargain over changes to terms and conditions of employment during the term of a CBA. Thus, the county's statutory-authority arguments lack merit.

## B. Arbitrary

Alternatively, the county contends that PERB's reinstatement, back-pay, and negotiation remedies are arbitrary because the remedies are "unreasonable and unjust" and PERB disregarded the remedies' collateral consequences. PERB responds that its decision "was based on the applicable legal standards, and articulated a rational connection between the facts found and decision made."[11]

Caselaw explains that an administrative decision is arbitrary if the agency (a) "relied on factors which the legislature had not intended it to consider"; (b) "entirely failed to consider an important aspect of the problem"; (c) "offered an explanation for the decision

---

[11] The parties argue with reference to the "arbitrary or capricious" standard of review set out in the Minnesota Administrative Procedure Act (MAPA). Minn. Stat. § 14.69(f) (2024) (permitting a reviewing court to "reverse or modify" an agency decision that is "arbitrary or capricious"); *see, e.g.*, *Citizens Advocating Responsible Dev. v. Kandiyohi Cnty. Bd. of Comm'rs*, 713 N.W.2d 817, 832 (Minn. 2006) (applying the "arbitrary and capricious" standard to review an agency decision under MAPA). Because we review PERB's decision under the common law, we follow the standard set out in *Dietz*, which references review for arbitrariness. 487 N.W.2d at 239.

that runs counter to the evidence"; or if (d) "the decision is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Minn. Transitions Charter Sch. v. Comm'r of the Minn. Dep't of Educ.*, 844 N.W.2d 223, 235 (Minn. App. 2014), *rev. denied* (Minn. May 28, 2014). And "an agency decision is arbitrary and capricious when [the agency's] determination represents its will and not its judgment." *Id.* (quotation omitted).

The county argues that PERB's remedy is arbitrary for four reasons, which we discuss in turn. First, the county argues that PERB's "interpretation and application of PELRA" is arbitrary because PERB "orders the County to reinstate the very pay increase it previously declared unlawful." In its brief to this court, PERB responds that "awarding back wages for the period from the unilateral rescission to the conclusion of successful bargaining was necessary to make the Union employees whole" because, without a retroactive remedy, the wage rescission would also decrease employees' annual percentage-based increases under the CBA.

PERB's response is sound. Upon finding that the county committed an unfair labor practice by unilaterally rescinding the January 10 wage increase and refusing to bargain, PERB was required to order the county to cease and desist from both practices—rescission of the wage increase and refusing to bargain. *See* Minn. Stat. § 179A.13, subd. 1(i). Ordering back pay is consistent with the cease-and-desist remedies.

Second, the county argues that "PERB is forcing the County to expend taxpayer dollars on a wage increase never authorized by the elected County Board." We disagree. The county's reasoning is faulty because it assumes the premise rejected above that only

wage changes by official act of the county board are unfair labor practices. We also note that PERB ordered remedies under its authority to "make the charging party whole" in response to the county's unilateral rescission of a wage increase. The county's position fails to address the remedial purpose of the reinstatement and back-pay order.

Third, the county appears to argue that the reinstatement and back-pay remedies impose an unreasonable expense. But unreasonable expense is not a defense to remedies for PELRA violations. *See Gen. Drivers Union Local 346 v. Indep. Sch. Dist. No. 704*, 283 N.W.2d 524, 528 (Minn. 1979) ("We are mindful of the economic burden imposed upon defendant . . . . Although regrettable, the plight defendant has brought upon itself is no defense to circumventing the protections granted the employee under PELRA."); *cf. NLRB v. Ogle Prot. Serv., Inc.*, 444 F.2d 502, 504 (6th Cir. 1971) (enforcing a back-pay order and rejecting the employer's argument that it would be "economically ruinous").

Finally, the county argues that PERB's mandatory bargaining remedy "raises two critical questions: 1) Since the PERB has ordered reinstatement of the wage increase, what remains to be bargained? 2) Should the parties reach impasse, does this Order permit the Union to strike despite the contract being closed?" The county concludes that the "unresolved questions underscore the arbitrary and capricious nature of the PERB's decision." We recognize that unresolved questions about a remedy's consequences could suggest that PERB "entirely failed to consider an important aspect of the problem." *Minn. Transitions Charter Sch.*, 884 N.W.2d at 235. But we conclude that the county has not shown that here.

31

As for the county's first "critical question"—what remains for mandatory bargaining—the supreme court has recognized that it may be appropriate to order mandatory bargaining even when an employer objects that bargaining would be futile. In *General Drivers Union*, the union challenged a school district's decision to contract bus-driving services with non-union workers. 283 N.W.2d at 525. The supreme court affirmed the district court's order requiring the school district to bargain despite already having contracted out the bus-driving services. *Id.* at 528. The supreme court "rejected the claim that once a decision to contract out is made any negotiation is futile" and reasoned that, "[e]ven if the school board decides to abide by its decision . . . , the effects of that decision, including such topics as severance pay and pension, may well be proper subjects for negotiation." *Id.*

Here, in response to the county's notice of the unilateral wage increase, the union demanded to negotiate, indicating its interest in "current wages," "amount of percentage increase," "[i]ncreases for all management employees," and "[r]elevant data from the compensation study that determined market rate" as potential topics for negotiation. Because PELRA requires bargaining over changes to wages, and because the union expressed its demand to negotiate over "proper subjects for negotiation," it was not arbitrary for PERB to order mandatory bargaining. *Id.*

The county's second "critical question"—whether failure to reach an agreement would allow union workers to strike—was raised for the first time on appeal. Generally, this court does not consider issues raised for the first time on appeal. *Thiele*, 425 N.W.2d at 582. Even so, public-employee strikes are authorized under PELRA only if "the

collective bargaining agreement between their exclusive representative and their employer has expired" and "the exclusive representative and the employer have participated in mediation over a period of at least 45 days." Minn. Stat. § 179A.18, subd. 1(1). Here, the CBA was not yet expired at the time of the county's unfair labor practices and continued in effect for some time after expiration. Minn. Stat. § 179A.20, subd. 6 ("During the period after contract expiration and prior to the date when the right to strike matures, and for additional time if the parties agree, the terms of an existing contract shall continue in effect and shall be enforceable upon both parties."). In short, the timeline and mediation requirements for a strike are unaffected by PERB's decision. Thus, the risk of strike is not an "important aspect of the problem." *Minn. Transitions Charter Sch.*, 884 N.W.2d at 235.

We conclude that reinstatement of the wage increase, back pay, and mandatory bargaining do not exceed PERB's statutory authority and that these remedies "make the charging party whole." We also reject the county's claim that the challenged remedies were arbitrary. *See* Minn. Stat. § 179A.13, subd. 1(i).

## III. Ex parte communications between the union and PERB do not require reversal.

The county argues that ex parte contacts between PERB and the union require reversal. After the county submitted its certiorari petition, it received the administrative record, which included copies of communications between PERB and the union that occurred before PERB released its decision and had not previously been disclosed to the county. On appeal, the county characterizes the correspondence between the union and PERB as "undisclosed substantive communications from the opposing

33

party . . . undermin[ing] the fundamental fairness required by Minnesota law" and asserts that it had no "opportunity to respond" because the communications were not disclosed until the appeal record was prepared.[12]

The first communication occurred on January 14, 2025, when the union emailed PERB's executive director, requesting, "[P]lease provide information regarding timelines for appeal decisions and or a potential timeline for a decision? The elected bargaining unit leaders are facing pressure from members to see this process moving forward and with public sector being right to work, I am concerned." PERB's executive director replied, "The Board is working on a decision/order. I cannot say when it will come out." About two hours later, the executive director followed up to add the union's attorney to the email thread, stating, "I apologize for not including you on my response . . . below." The PERB executive director did not copy or forward the emails to the county.

---

[12] The county raises this issue for the first time on appeal; as explained above, the county had no notice of the relevant communications until it received the administrative record. Appellate courts generally will not consider an issue raised for the first time on appeal. *Thiele*, 425 N.W.2d at 582. This court may, however, "review any other matter as the interest of justice may require." Minn. R. Civ. App. P. 103.04. We are guided by the supreme court's reasoning in *In re Expulsion of A.D.*, 883 N.W.2d 251 (Minn. 2016). There, the supreme court addressed an issue raised for the first time on appeal when there was "no possible advantage or disadvantage to either party in not having a prior ruling on the question." *A.D.*, 883 N.W.2d at 261 (quotation omitted). The supreme court reasoned that "[p]arties are not disadvantaged when the previously unaddressed issue involves a question of law and the parties had an opportunity to brief the issue." *Id.*

Here, the parties briefed the merits of this issue and respondents do not object to this court deciding the issue. Because the legal principles are clear and the facts are undisputed, remand to PERB is not necessary. *Frazier v. Burlington N. Santa Fe Corp.*, 811 N.W.2d 618, 628-29 (Minn. 2012) (addressing an issue raised for the first time on appeal to avoid remand "[i]n the interest of judicial economy"). A complete resolution of the issues will be of greater assistance to the parties and is therefore in the interests of justice. *See* Minn. R. Civ. App. P. 103.04.

The second communication is dated March 11, 2025; the union wrote to the PERB chairperson, stating:

> The employer appealed [the hearing officer's] decision in September 2024. We are still awaiting the appeal response.
>
> . . . .
>
> [W]e are very concerned about our bargaining unit. We are a new union, going into our third contract and our members are pressing us for answers. We have had some people drop their membership and are concerned that further delay will be a hindrance as we prepare for contract negotiations this fall.
>
> If there is anything the workers can do to help move this process forward, please let us know.

The PERB chair forwarded the letter to PERB's executive director, who forwarded it to the union's attorney and stated, "See attached letter from your client to the PERB Board Chair. I've advised her that she should not respond to the letter. We are working on the decision and it should be issued in the near future. Please let me know if you need additional follow up." Again, the county was not copied on or forwarded any of this correspondence.

The county makes two arguments to urge that these ex parte communications require reversal: (1) the emails were "substantive and coercive . . . [by] pressuring the PERB to issue its ruling based on improper consideration, including the Union's claim that it lost members due to this dispute"; and (2) the March correspondence was sent "just two days" before PERB issued its order, and therefore, it raises "serious concerns about the undue influence such communications may have had on the PERB's ultimately flawed ruling." PERB contends that "[n]one of the PERB members here communicated with the union" and "[t]he executive director is not a member of the PERB and thus not a

35

decisionmaker." Also, "reversal [is] unwarranted because [the executive director's] communications were procedural and not substantive."

Rules enacted under PELRA do not address ex parte communications during PERB proceedings. *See generally* Minn. R. 7325.0010-.0410 (2023). In the context of MAPA, the supreme court considered whether an agency decision appropriately ordered corrective action when there was "substantial evidence" of "ex parte communication which tainted the proceedings." *In re Petition of N. States Power Co.*, 414 N.W.2d 383, 385 (Minn. 1987) (determining that ex parte communications between a member of the Minnesota Public Utilities Commission and a power company seeking a rate increase supported the commission's reconsideration of decisions in which the member's vote was "decisive"). Here, the county contends, and we will assume without deciding, that reversal may be required when ex parte communications taint the proceedings.

Caselaw clarifies the circumstances under which ex parte communications may taint the proceedings. First, an administrative judge's ex parte communication with a party may require a new hearing when those communications impugn the decisionmaker's impartiality and relate to the substance of the proceedings, as seen in *Meinzer v. Buhl 66 C & B Warehouse Distributing, Inc.*, 584 N.W.2d 5 (Minn. App. 1998). There, this court ordered a new hearing when a reemployment-insurance judge, during a recess in the proceedings, discussed evidence and laughed with the employer while the employee was out of the room. *Meinzer*, 584 N.W.2d at 7. This court explained that "[e]x parte discussion of evidence in this case, followed by laughter, undermined Meinzer's confidence in the impartiality and unbiased nature of her hearing." *Id.*

36

A second opinion provides a helpful contrast to *Meinzer*. In *Moes v. City of St. Paul*, a workers' compensation judge "misplaced employee's brief and by ex parte communication, requested an additional copy of his brief." 402 N.W.2d 520, 523 (Minn. 1987). On appeal, the supreme court determined that, "[a]lthough not grounds for reversal in the present case, we wish to caution against ex parte communications between a judge and one of the parties . . . . The [workers'] compensation judge should have also notified [the employer] of the communication in order to avoid any appearance of prejudice." *Id.* at 524 n.2.[13]

With this caselaw in mind, we separately examine the January and March communications. The union's January 14, 2025 email expressed "pressure from members" for a decision by PERB, and PERB's executive director replied directly to the union and its attorney without copying the county. While this is troubling, two factors lead us to

---

[13] PERB suggests in a footnote that, in reviewing the union's ex parte communications with PERB, this court should find guidance in the Minnesota Code of Judicial Conduct, reasoning that "its canon on ex parte communication supports the conclusion that the PERB and its executive director acted properly." The code provides that, if a judge "inadvertently receives an unauthorized ex parte communication bearing upon the substance of a matter, the communication should be noted as received and returned to the sender without review by the judge." Minn. Code Jud. Conduct Rule 2.9(B). If a judge "inadvertently reviews" the communication, "the judge shall make provision to notify the parties promptly of the substance of the communication and provide the parties with an opportunity to respond." *Id.*

PERB argues by analogy that it did not act improperly in response to the union's January or March correspondence because neither the executive director nor the chair received or reviewed a communication "bearing on the substance of a matter." As to the March communication, the PERB chair did not review it and returned the communication to the union through PERB's executive director. PERB concludes that it therefore was "not required to notify the parties or provide an opportunity to respond." In light of the relevant caselaw cited in this opinion, we need not decide whether a standard similar to the Minnesota Code of Judicial Conduct should apply to PERB.

conclude that the January emails did not taint the proceedings. First, the content of PERB's email to the union was a status update and did not address the "pressure from members" raised by the union; and second, PERB's email was written by its executive director, who was not a decisionmaker. *See* Minn. Stat. § 179A.041, subds. 1, 2(a)(5) (defining PERB's composition and powers of its members). Thus, while the union's communication was inappropriate and it is better practice for PERB's executive director to copy all parties on their communications, the January emails did not taint the proceedings.

The March correspondence is a closer call because the union communicated with the PERB chair, who is a decisionmaker, and the union's letter appears to be an attempt to influence the timing of PERB's decision. Even the appearance of impropriety undermines public confidence in PERB. *Cf. N. States Power Co.*, 414 N.W.2d at 386 (reasoning that the "appearance of impropriety . . . undermines the public confidence in the system" for setting utility rates).

We conclude, however, that the March correspondence did not taint the proceedings for two reasons. First, the PERB chair did not review or reply to the union's letter and PERB's executive director responded with a general status update. By forwarding the union's letter to PERB's executive director, the PERB chair maintained the appearance of impartiality.

Second, the March correspondence did not concern the substance of PERB's decision and no evidence suggests that PERB was influenced by the union correspondence with regard to the timing or substance of its decision. Even when there is an improper ex parte communication, the relator "bears the burden of demonstrating prejudicial error."

*Koes v. Advanced Design, Inc.*, 636 N.W.2d 352, 363 (Minn. App. 2001) (rejecting argument for reversal based on ex parte communications because there was no evidence of any substantive communications or prejudice resulting from ex parte communications), *rev. denied* (Minn. Feb. 19, 2002).

In short, parties should abstain from ex parte communications with PERB about timing and procedure and, in the event of an ex parte inquiry, PERB should respond to any ex parte communication, at the very least, by communicating with all parties. Still, when ex parte inquiries concern the timing of PERB's decision, as did the communications the county challenges, they will seldom undermine "confidence in the unbiased nature" of proceedings or result in prejudice. *Meinzer*, 584 N.W.2d at 7. Therefore, we conclude there is no ground for reversal.

## DECISION

The county failed to establish legal error in PERB's determinations that the county's unilateral implementation and rescission of the January 10 wage increase and its refusal to negotiate with the union about the wage changes were unfair labor practices. PERB's order directing reinstatement of the wage increase, back pay, and mandatory bargaining as remedies did not exceed PERB's statutory authority and was not arbitrary. Finally, although two improper ex parte communications occurred between the union and PERB, these communications did not undermine confidence in the proceedings or prejudice the outcome and therefore do not warrant reversal.

**Affirmed.**